SPERTUS, LANDES & UMHOFER, LLP
James W. Spertus (SBN 159825)
Samuel A. Josephs (SBN 284035)
1990 South Bundy Dr., Suite 705
Los Angeles, California 90025
Telephone: (310) 826-4700
Facsimile:  (310) 826-4711

Attorneys for Defendant Michael S. Flowers

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>MICHAEL S. FLOWERS,<br><br>                    Defendant. | CASE NO.  CR 17-732-SJO<br><br>**MICHAEL FLOWERS'**<br>**SENTENCING BRIEF**<br><br>DATE:        May 29, 2018<br>TIME:          9:00 a.m. |

        Defendant Michael Flowers, by and through his counsel of record, hereby respectfully submits his Sentencing Brief.


Dated:  May 15, 2018          Respectfully submitted,

                              SPERTUS, LANDES & UMHOFER, LLP


                              By:    /S James W. Spertus_____
                                     James W. Spertus
                                     Samuel A. Josephs
                                     Attorneys for Michael Flowers

MICHAEL FLOWERS' SENTENCING BRIEF

1

## <u>TABLE OF CONTENTS</u>

2
<u>PAGE</u>

3
I.   INTRODUCTION ................................................................. 1

4

5
II.   THE STAUTORY SENTENCING FRAMEWORK ............................ 4

6
   A.   The Threshold Question For The Court Is Whether
Probation Is Sufficient Or Whether Prison Is Necessary ........... 4

7

8
   B.   Section 3553(a) Supports Probation In This Case ..................... 6

9
     1.   Mr. Flowers' History and Characteristics ............................ 7

10
       a.   Mr. Flowers is universally described as a selfless
person who generously cares for other people. ............. 11

11
       b.   Mr. Flowers is a hard working employee ...................... 14

12
       c.   Mr. Flowers is a mentor that is committed to his
community. ................................................................. 15

13

14
     2.   Mr. Flowers' Non-Malicious Motive (And Good-Faith
Ignorance of the Law) Supports Probation ........................ 16

15
     3.   Mr. Flowers' Efforts Brokering Agreements With the
Governmen and Agreeing to the Government's Loss

16
      Theory Supports Probation ................................................ 18

17
III.   CONCLUSION .................................................................. 20

18

19

20

21

22

23

24

25

26

27

28

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

i.

MICHAEL FLOWERS' SENTENCING BRIEF

1

## TABLE OF AUTHORITIES

2

**PAGE**

3

## CASES

*Dorsey v. United States,*
   567 U.S. 260 (2012).........................................................................16

*Gall v. United States,*
   552 U.S. 38 (2007)....................................................................3, 4, 6

*Kimbrough v. United States,*
   552 U.S. 85 (2007)............................................................................4

*Koon v. United States,*
   518 U.S. 81 (1996)............................................................................8

*Lafler v. Cooper,*
   132 S. Ct. 1376 (2012)....................................................................19

*Nash v. United States,*
   229 U.S. 373 (1913)..........................................................................2

*Pepper v. United States,*
   562 U.S. 476 (2011)..........................................................................8

*Peugh v. United States,*
   569 U.S. 530 (2013)......................................................................4, 8

*Rita v. United States,*
   551 U.S. 338 (2007)..........................................................................4

*United States v. Brigham,*
   977 F.2d 317 (7th Cir. 1992) ..........................................................19

*United States v. Carty,*
   520 F.3d 987 (9th Cir. 2008) ............................................................4

*United States v. Hack,*
   443 F. App'x 304 (9th Cir. July 18, 2011) ......................................16

*United States v. Knights,*
   534 U.S. 112 (2001)..........................................................................6

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

ii.

---

MICHAEL FLOWERS' SENTENCING BRIEF

*United States v. Mahan,*
    232 F. App'x 796 (10th Cir. May 16, 2007) ...................................................... 16

*United States v. Milne,*
    384 F. Supp. 2d 1309 (E.D. Wis. 2005) ............................................................ 17

*United States v. Perez-Nava,*
    513 F. App'x 694 (9th Cir. Mar. 22, 2013) ........................................................ 7

*United States v. Ranum,*
    353 F. Supp. 2d 984 (E.D. Wis. 2005) ............................................................. 17

*United States v. Ressam,*
    679 F.3d 1069 (9th Cir. 2012) ......................................................................... 19

*United States v. Reyes,*
    8 F.3d 1379 (9th Cir. 1993) .............................................................................. 7

*United States v. Ruff,*
    535 F.3d 999 (9th Cir. 2008) ......................................................................... 6, 8

*United States v. Stern,*
    590 F. Supp. 2d 945 (N.D. Ohio 2008) ............................................................ 18

*United States v. Stewart,*
    590 F.3d 93 (2d Cir. 2009) .............................................................................. 19

*Wasman v. United States,*
    468 U.S. 559 (1984)..........................................................................8, 11, 12

*Williams v. New York,*
    337 U.S. 241 (1949).......................................................................................... 8

*Wisconsin v. Mitchell,*
    508 U.S. 476 (1993).......................................................................................... 16

## STATUTES

18 U.S.C. § 3551 ..............................................................................................5, 7

18 U.S.C. § 3553 ......................................................................................... passim

28 U.S.C. § 994 ...............................................................................................5, 6

## OTHER AUTHORITIES

Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984)......................................... 7

iii.

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

S. Rep. No. 98-225 ................................................................... 5

U.S.S.G. § 4A1.3(b)(1) ............................................................ 7

U.S.S.G. § 5F1.1 ...................................................................... 6

U.S.S.G. § 5F1.2 ...................................................................... 6

U.S.S.G. § 5F1.3 ...................................................................... 6

U.S.S.G. § 5F1.5 ...................................................................... 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

iv.

MICHAEL FLOWERS' SENTENCING BRIEF

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The parties agree that this case is outside the "heartland" of cases contemplated by the Sentencing Guidelines, and that a downward variance is appropriate.  That is, there is no dispute between the parties that this is an unusual case that justifies a **below-Guidelines sentence**.  What really sets this case outside the "heartland" of cases, however, is that Michael Flowers committed federal bribery, accepted responsibility for committing federal bribery, and yet not until this case did he really understand that what he did constituted federal bribery.  Now having a full understanding of his offense conduct, Mr. Flowers has gone to great lengths to assist the government in securing a conviction against his former employer, and obtaining nearly one million dollars in restitution.

There is no dispute that for years Mr. Flowers received information from a friend free of charge.  There is no dispute that the information—**quarterly** wage information—was not public, because Mr. Flowers was able to access only **annual** wage information through the databases that were available to him as a debt collector.  There is also no dispute that the quarterly wage information had value to Mr. Flowers as a debt collector because it enabled him to assess the viability of collection efforts.  And there is no dispute that at some point, Mr. Flowers began paying his friend nominal amounts for the quarterly wage information.  But it was not until the government's investigation in this case that Mr. Flowers truly understood that his conduct was not only illegal, but that it constituted federal bribery.  Mr. Flowers understands that completely now, and is not in any way minimizing the fact that he broke the law.  Yet, while ignorance of the law is certainly not a defense, Mr. Flowers' intent matters for sentencing purposes.  As Justice Holmes once said, "the [criminal] law is full of instances

1.

1  where a man's fate depends on his estimating rightly." *Nash v. United States*, 229
2  U.S. 373, 377 (1913).

3       Indeed, the Guidelines in this case do not provide a meaningful starting
4  point from which to impose an adequately particularized sentence for at least three
5  reasons.

6       **First,** the federal bribery Guidelines do not accurately reflect the nature and
7  circumstances of the offense in this case. For approximately fifteen years, a close
8  friend of Michael Flowers, who worked for an Arizona state agency, provided Mr.
9  Flowers with quarterly wage and earnings information that Mr. Flowers used to
10 assess the viability of pursuing claims as a debt collector. At some point, Mr.
11 Flowers started paying his friend approximately $500 a month, which Mr. Flowers
12 received from his employer, Professional Collection Consultants ("PCC"),
13 because Mr. Flowers thought paying for the information he was previously getting
14 for free was the right thing to do. **Mr. Flowers was wrong, he understands that**
15 **what he did was illegal, and he fully accepts responsibility for his criminal**
16 **wrongdoing**. But motive matters, and Mr. Flowers did not set out to bribe a
17 public official, as the federal bribery Guideline contemplates.

18      **Second,** the federal bribery Guidelines do not accurately account for Mr.
19 Flowers' history and characteristics. As Todd Shields, owner of The Best Service
20 Company ("Best") tells the Court, in the twelve years Mr. Flowers has worked for
21 Mr. Shields and Best, Mr. Shields believes Mr. Flowers to be "one of the hardest
22 working, honest, most diligent, and thoughtful individuals that I have had the
23 pleasure of working with." (Declaration of Samuel A. Josephs ¶ 2; Exhibit 17.)
24 And aside from his professionalism on the job, Mr. Flowers is also a true pillar of
25 the community—he is a founding member of Los Angeles Black Pride, an
26 organization representing the black LGBTQ community of Los Angeles, and as a
27 part of that organization, he has done extensive outreach in the community on
28 behalf of people suffering from HIV/AIDS. Mr. Flowers is a man who has done a

2.

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

lot of good for others in his life, which sets him apart from many of the individuals who appear before this Court for sentencing who have done nothing to better the community.

**Third,** sentencing Mr. Flowers to a period of probation in lieu of prison would account for Mr. Flowers' efforts in brokering agreements between the government, PCC, and others.  Mr. Flowers not only assisted the government in securing a conviction against PCC, Mr. Flowers also helped the government secure $946,770 in restitution from PCC by agreeing to the government's loss theory, which deemed the value of the benefit received in this case to be the amount of money PCC was able to collect as a result of the information obtained by Mr. Flowers, rather than the amount of money Mr. Flowers paid in exchange for the information (approximately $30,000).  Neither the government nor the defense can meaningfully correlate specific collection results to specific cases where information came from Mr. Flowers's friend.  Nonetheless, Mr. Flowers agreed to the government's loss theory— that all of Mr. Flowers' collection efforts during the relevant time period are attributable to the information he obtained from the Arizona state official—in an effort to accept responsibility.  The government, no doubt, made concessions of its own, but the point is that Mr. Flowers played an important role in helping the government obtain nearly one million dollars from PCC.

In this case, each of the goals of sentencing can be achieved through, what the Supreme Court has called, the "significant impact" of home confinement and probation, *Gall v. United States*, 552 U.S. 38, 49 n.4 (2007), especially for a person like Mr. Flowers who has been described by his employer as "one of the hardest working, honest, most diligent, and thoughtful individuals that I have had the pleasure of working with." (Exhibit 17.)  Mr. Flowers respectfully requests that the Court impose three years of probation and 200 hours of community service pursuant to the factors set forth in 18 U.S.C. § 3553(a).  It is not lost on

3.

1   undersigned counsel that defense attorneys often ask the Court to impose non-
2   custodial sentences on their clients.  But some cases truly warrant probation, and
3   this is such a case.

## II.

## THE STAUTORY SENTENCING FRAMEWORK

6       Under the parsimony principle in 18 U.S.C. § 3553(a), the Court must
7   arrive at a sentence sufficient but not greater than necessary to achieve the goals
8   of sentencing.  *See* 18 U.S.C. § 3553(a).  Indeed, the Supreme Court has stressed
9   that the parismony principle—not the Guidelines—is **the most important** overall
10  factor in a court's sentencing decision.  *Kimbrough v. United States*, 552 U.S. 85,
11  109-111 (2007).  While "the Guidelines should be the starting point and the initial
12  benchmark," the district court "must then consider the arguments of the parties
13  and the factors set forth in § 3553(a)."  *Peugh v. United States*, 569 U.S. 530, 536
14  (2013) (internal quotation marks omitted).  "The district court may not presume
15  that the guideline range is reasonable." *Id.* (internal quotation marks omitted); *see*
16  *also Rita v. United States*, 551 U.S. 338, 351-52 (2007).  The Guidelines are **not**
17  to be given more weight or consideration than any other factor in the sentencing
18  analysis.  *United States v. Carty*, 520 F.3d 987, 991 (9th Cir. 2008) (en banc).

19      It is also critical for the Court to understand that its charge is emphatically
20  not to impose a "reasonable" sentence, but to impose a particularized sentence
21  minimally sufficient to accomplish the statutory purposes of sentencing.  *See*
22  *Carty*, 520 F.3d at 995 ("The district court must make an individualized
23  determination based on the facts." (citing *Gall v. United States*, 552 U.S. 38, 50
24  (2007))) .

## A.   The Threshold Question For The Court Is Whether Probation Is Sufficient Or Whether Prison Is Necessary

27      In the context of criminal sentencing, Congress expected a threshold
28  question would be asked:  whether probation is sufficient or whether prison is

4.

MICHAEL FLOWERS' SENTENCING BRIEF

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1   necessary.  Congress instructed the Sentencing Commission to promulgate

2   guidelines for the sentencing court to determine "**whether to impose a sentence**

3   **to probation,** a fine, **or a term of imprisonment**."  28 U.S.C. § 994(a)(1)A)

4   (emphasis added).  In so instructing, Congress wanted to ensure that the

5   Sentencing Guidelines "reflect the general appropriateness of imposing a sentence

6   other than imprisonment in cases in which the defendant is a first offender who

7   has not been convicted of a crime of violence or an otherwise serious offense, and

8   the general appropriateness of imposing a term of imprisonment on a person

9   convicted of a crime of violence that results in serious bodily injury."

10  28 U.S.C. § 994(j).  In other words, Congress concluded that probation would be

11  generally inappropriate only for a person convicted of a crime of violence that

12  results in serious bodily injury.  In fact, Congress recognized that probation would

13  often satisfy the goals of sentencing: "It may very often be that release on

14  probation under conditions designed to fit the particular situation will adequately

15  satisfy any appropriate deterrent or punitive purpose.  This is particularly true in

16  light of the new requirement in section 3563(a) that a convicted felon who is

17  placed on probation must be ordered to pay a fine or restitution or to engage in

18  community service."  S. Rep. No. 98-225 at 92 (1983).  Congress also recognized

19  that non-custodial punishments involving community service benefit society

20  rather than consume taxpayer resources.  18 U.S.C. § 3551.

21      In turn, the Guidelines Manual encourages courts to think of "probation [as]

22  a sentence in and of itself," and as "an alternative to incarceration" that may

23  properly account for the section 3553(a) factors.  U.S. Sentencing Guidelines

24  Manual, Chapter 5, Part B – Probation, Introductory Commentary.  Accordingly,

25  the Guidelines include several non-custodial options, including community

26  confinement (U.S.S.G. § 5F1.1), home detention (U.S.S.G. § 5F1.2), community

27  service (U.S.S.G. § 5F1.3), and occupational restrictions (U.S.S.G. § 5F1.5).  In

28  addition, on April 12, 2018, the Commission proposed amending the Guidelines to

5.

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

accord with the directives in 28 U.S.C. § 994(j) as a result of the Commission's continued study of alternatives to incarceration. *See* U.S. Sentencing Comm'n, "Notice of Final Priorities," 82 FR 39949 (Aug. 22, 2017). (Exhibit 18: Proposed Amendment: Alternatives to Incarceration for Nonviolent First Offenders.)

Moreover, the Supreme Court has made clear that judges must consider all of "the kinds of sentences available" by statute, 18 U.S.C. § 3553(a), even if the "kinds of sentences . . . established [by] the guidelines" permit or only encourage prison. *See Gall*, 552 U.S. at 59 n.11. In doing so, courts have recognized that probation is a significant sanction. Probationers are "subject to several standard conditions that substantially restrict their liberty." *Id.* at 48. "Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *United States v. Knights*, 534 U.S. 112, 119 (2001) (citations omitted). The impact of probation is serious and notable:

> [T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society . . . . Often these conditions comprehensively regulate significant facets of their day-to-day lives . . . . They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a caseworker or psychotherapist.

*Gall*, 552 U.S. at 49 n.4. *See also United States v. Ruff*, 535 F.3d 999, 1004 (9th Cir. 2008) (probationary sentences are "quite oppressive" due to restrictions that accompany them).

**B.**   **Section 3553(a) Supports Probation In This Case**

Section 3553(a) suports a probationary sentence here due to the fact that Mr. Flowers is a non-violent offender with no serious criminal history[1] and zero

---

[1]   It is true that Mr. Flowers has two prior misdemeanors for driving under the influence, occurring nineteen and nine years ago, respectively. Because of the latter misdemeanor, Mr. Flowers is in criminal history category II since he was on

6.

1   chance of recidivism.  Indeed, section 3553(a)(2) requires courts to consider the

2   need for a sentence to prevent a defendant from endangering society through

3   future criminal conduct.  *See* 18 U.S.C. § 3553(a)(2)(B)-(C).  To that end,

4   Congress has stated that "sentencing decisions should be designed to ensure that

5   prison resources are, first and foremost, reserved for those violent and serious

6   criminal offenders who pose the most dangerous threat to society."  Pub. L. No.

7   98-473, § 239, 98 Stat. 1987, 2039 (1984) (note to 18 U.S.C. § 3551).  Mr.

8   Flowers is not only **not** a serious criminal offender who poses a dangerous threat

9   to society, he is an asset to the community.

10          1.    *Mr. Flowers' History and Characteristics*

11          "It has been uniform and constant in the federal judicial tradition for the

12   sentencing judge to consider every convicted person as an individual and every

13   case as a unique study in the human failings that sometimes mitigate, sometimes

14   magnify, the crime and the punishment to ensue."  *Pepper v. United States*, 562

15

16   summary probation at the time of the instant offense.  PSR ¶ 37.  Mr. Flowers has

17   had no alcohol-related issues since 2009.  Where a defendant's criminal history
     score overstates the seriousness of his past criminal conduct, propensity to commit

18   crimes, or danger to the community, courts can—and often do—vary downward to
     a more parsimonious sentence.  *See, e.g.*, *United States v. Perez-Nava*, 513 F.

19   App'x 694, 695 (9th Cir. Mar. 22, 2013) ("The record reflects that the district
     court varied downward to reflect its belief that Perez-Nava's criminal history was

20   overstated."); *United States v. Reyes*, 8 F.3d 1379, 1381-89 (9th Cir. 1993) (in pre-
     *Booker* era, upholding downward departure in both offense level and criminal-

21   history category—from 210 to 33 months—where the defendant was a relatively
     minor offender with six minor drug and theft priors, though remanding to trial

22   court to better explain extent of departure); U.S.S.G. § 4A1.3(b)(1) ("If reliable

23   information indicates that the defendant's criminal history vategory substantially
     over-represents that the defendant will commit other crimes, a downward

24   departure may be warranted.").  Mr. Flowers submits that criminal history

25   category II over-represents the seriousness of his criminal history, especially given

26   that Mr. Flowers was on summary probation at the time of the instant offense,

27   which imposes no supervision or similar restrictions on an individual and that he
     did not intend to violate his summary probation in 2010.

28

7.

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700/ Fax: 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" *Id.* at 487-88 (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).  In particular, the Supreme Court has "emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Id.* at 488 (2011) (quoting *Williams*, 337 at 246)). "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Id.* (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

Aside from the unusual facts of this case, what sets this case apart and thus makes probation appropriate is who Mr. Flowers is as a person.  Despite his mistakes in this case, Mr. Flowers is a good person who has done much to serve his community.  Mr. Flowers is a founding member of Los Angeles Black Pride, an organization representing the black LGBTQ community of Los Angeles.  As part of that organization, Mr. Flowers has done extensive outreach on behalf of people suffering from HIV/AIDS, including organizing HIV/AIDS testing and treatment.  Mr. Flowers has also provided shelter for numerous individuals over the years from that same community who were previously living in homeless shelters.  He has paid for the funerals of friends who died of HIV/AIDS when their families were unable to afford them.  He also cares for an older man named Jerry, who is deaf, and on disability.

Mr. Flowers grew up in Carson, California.  He was raised by a single mother who worked two full-time jobs—one as a registered nurse in a convalescent home, the other teaching junior high school English.  Mr. Flowers and his twin sister, Michelle, grew up with two older brothers, Steve and Ray, who were seven and ten years older, respectively.  Steve and Ray were a

8.

MICHAEL FLOWERS' SENTENCING BRIEF

destructive presence in the home: Ray was an alcoholic and Steve sold and abused drugs. With their mother gone, Mr. Flowers felt so unsafe in their home as a child that he spent much of his youth at the neighbor's house.

Despite the disruption at home, Mr. Flowers excelled in school: he was a Boy Scout, eventually achieving the rank of Eagle Scout, was a member of junior council, and played in the school's marching band. Mr. Flowers also ran on the high school track and cross country teams. After graduating high school, Mr. Flowers attended a Christian college started by his grandparents in Terrell, Texas—Southwestern Christian College—where his cousin is the current President. During his time in Terrell, Mr. Flowers worked at a local mental hospital as a nurse's aide. After one year in Terrell, Mr. Flowers transferred to Cardinal Stretch College in Milwaukee, WI. Mr. Flowers' best friend at Southwestern was from Milwaukee, and Mr. Flowers went and lived with him and his family in Milwaukee because he didn't want to return to Carson and live with his brothers Steve and Ray. Some years later, Steve was shot and killed by police during a high-speed pursuit.

After one year in Milwaukee, Mr. Flowers transferred to Cal State Dominguez Hills and lived on campus. At Cal State, Mr. Flowers studied music and political science. In his final year at Cal State, he was named "Mr. Cal State Dominguez Hills."

Shortly after Mr. Flowers returned to California to attend Cal State, his mother died suddenly of a blood clot. After his mother passed away, Mr. Flowers discovered he had been receiving social security assistance from his father, which was being used to pay for Mr. Flowers' education. The checks ceased when Mr. Flowers turned twenty-one, so Mr. Flowers was unable to finish school. He dropped out and began working.

After a few years working for temporary placement agencies, Mr. Flowers began in the collection business. He started with a company called Household

9.

MICHAEL FLOWERS' SENTENCING BRIEF

Finance, where he stayed for six years.  He then went to work for CFCA (California Financial Collection Association), where he worked for the next nineteen years.  In 2006, Mr. Flowers met the owners of PCC.  He began working there shortly after, mostly because it was a shorter commute between his home and the PCC office.

Submitted in connection with this Sentencing Position, as Exhibits 1 through 17, are seventeen character reference letters that describe Mr. Flowers' generous, devoted and honorable character, as well as his commitment to his friends and his wider community.  Below is just a sampling of portions of those letters submitted on Mr. Flowers' behalf.  Mr. Flowers respectfully requests that the Court, in fashioning an appropriate sentence under 18 U.S.C. § 3553(a), consider Mr. Flowers's overall character, and the significant efforts he has made over his lifetime to take care of his friends and devote his time to various community organizations.

It is worth mentioning that while this Court reads character letters submitted in support of sentencing all the time, the letters submitted on Mr. Flowers' behalf provide a real window into what kind of person Mr. Flowers is when no one is looking.  Letter after letter describes Mr. Flowers as a generous and selfless person.  In many ways, those good characteristics are present in Mr. Flowers' offense conduct in this case.  Mr. Flowers didn't understand that paying his friend for non-public information conduct was illegal, which he clearly understands now. He paid him because he thought it was appropriate to do so and that it was the right thing to do.  While that was wrong, and he recognizes it was wrong, the attached letters should help the Court better understand Mr. Flowers' motivation in this case, which is paramount in sentencing.

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

10.

Spertus, Landes & Umhofer, LLP
1990 S. BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TEL: 310-826-4700; FAX: 310-826-4711

a.     <u>Mr. Flowers is universally described as a selfless person who
generously cares for other people.</u>

Mr. Flowers grew up without a father and lost his mother when he was eighteen years old.  (Ex. 8, Letter to Court from R. Norris-Yatta.)   He was fortunate to grow up in a strong religious community that provided support— though his religious upbringing was its own cross to bear given that Mr. Flowers' sexual orientation was not accepted by by the religious community of which he was a part.  PSR ¶ 47.  Having never met his biological father, Mr. Flowers was raised by Mr. Robert Norris-Yatta, who has known Mr. Flowers since 1968 and sees himself as a "father-like figure."   Mr. Norris-Yatta describes Mr. Flowers as a "hard and dedicated worker on any job he undertakes and a man of compassion and deep spiritual convictions of Christianity." (Ex. 8.)  Mr. Norris-Yatta has not lived in Los Angeles for twenty years, yet Mr. Flowers continues to stay in touch and even provides financial support to help Mr. Norris-Yatta afford his "monthly mortgage and necessary medication," an act of kindness which does not surprise him as Mr. Flowers "always showed respect and gave assistance to the elderly members of his church family, … since his early childhood years."  (*Id.*)

Another friend who views Mr. Flowers as family is Ms. Catherine L. DeShields, who describes him as "very dear to me and I think of him as my son. He calls me Mom and has helped me and my family out in many ways."  (Ex. 4, Letter to Court from C. DeShields.)   Ms. DeShields and her family have all benefitted from Mr. Flowers' generosity describing how he took care of her daughter and granddaughters, and especially her son, Carmelo DeShields, who was suffering from AIDS and living alone in Las Vegas:  "Michael rented a car, drove to Vegas, picked up my son and took him back to Los Angeles where he proceeded to take care of him and tried to nurse him back to health.  Only when Michael could no longer take care of my son . . . did he contact me."  (*Id.*)  She goes on to describe how Mr. Flowers flew her from Pennsylvania to Los Angeles

11.

two times so she could see her son at the hospital and help arrange for him to return to Pennsylvania, "Michael even paid for both Mel and myself to return to Pennsylvania, plus gave Mel a few dollars to help him through the transition from one state to another.  My son . . . is now well enough to live alone again. . . . There are no words to express how grateful I am to Michael."  (*Id.*)

Mr. Carmelo DeShields describes Mr. Flowers as "the kind of person who opens his self to people selflessly."  (Ex. 3, Letter to Court from Carmelo DeShields.)  He goes on to describe how Mr. Flowers "became my sole care giver. While caring for me he dealt with my aids related dementia, loss of physical control of my body, and pneumocystis carinii pneumonia (PCP) and many other aids related issues."  (*Id.*)  Mr. Deshields describes how Mr. Flowers visited him every day in the hospital for six weeks and credits Mr. Flowers with giving him "the ability to have the life that I have now.  If it wasn't for him I would not be alive to write this letter."  (*Id.*)

Sterling Rice describes Mr. Flowers as "this amazing man I call My Dad." (Ex. 10, Letter to Court from S. Rice.)  Mr. Rice has known Mr. Flowers for eight years and describes how Mr. Flowers helped him move from Cincinnati, Ohio to Los Angeles:  "Michael held out his hands and took me into his awesome heart and home.  He gave me somewhere to live!  He gave me my first job in California!  He helped me get my driver's license . . . and my first car.  He taught me how to manage money and how to think on a more spiritual, professional and business level!"  (*Id.*)

Ms. Lorraine Yorke describes Mr. Flowers as a "one-of-kind human being" that is "always there for [her] mentally, emotionally and physically."  (Ex. 15, Letter to Court from L. Yorke.)  She describes how they came to live together so that he could help her pay her mortgage and save her home from foreclosure.  (*Id.*) She notes that Mr. Flowers also shows acts of kindness to strangers as well as her own extended family and believes that "whatever he did wrong . . . he probably

12.

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

was once again attempting to 'do some good' for others without any thought of the harm he would bring upon himself." (*Id.*)

Mr. Flowers is a man who has always been devoted, loving and caring to his friends.  If anyone is in need, Mr. Flowers is there to support them.  This devotion to friends is exemplified in the many letters describing his generous assistance both in time and money to help out a friend in need.  "Michael would give the shirt off his back to help someone in need." (Ex. 4, Letter to Court from C. DeShields.)  Mr. Garvin Glass is a longtime childhood friend and considers Mr. Flowers to be a "Christian brother of mine" where he has observed Mr. Flowers "taking food to the elderly, singing at charitable events, and visiting the sick members of our congregation." (*Id.*)

Mr. Rahnee J. Cook has known Mr. Flowers for over thirty years and considers him his "best friend." (Ex. 2, Letter to Court from R. Cook.)   Mr. Cook recalls Mr. Flowers "helping a single mother struggling to work and take care of her children while attending school at the same time.  Michael offered to baby sit when she would get off work so her children would be cared for while she was in school at night.  Michael did this for free, out of the benevolence in his heart." (*Id.*)  Mr. Cook goes on to describe Mr. Flowers as "a stand up guy who will be there to support people in need and provide civic work and support for a just cause." (*Id.*)  He also notes that Mr. Flowers would be "excellent at providing some type of community service, i.e., creating musical events and exposing children and people of the community to the art of music through song." (*Id.*)

Another longtime friend of thirty years, Mr. Gerald L. Banks, feels honored to write in support of Mr. Flowers:  "This respect stems from my personal observation of his conduct when interacting with people from all walks of life and treating them all the same." (Ex. 1, Letter to Court from G. Banks.)  He describes how the two of them worshipped together, sang in the choir and helped at "community social events, fundraisers and charitable work such as feeding the

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

homeless." (*Id.*)  Mr. Banks goes on to explain how Mr. Flowers has continued to be kind and patient with him when he became deaf:  "his kindness and patience exceeded that of even some of my closest family members . . . not once has he allowed my disability to become a burden nor an embarrassment to him in social settings." (*Id.*)

Retired Milwaukee police detective, William Smith, who has known Mr. Flowers for at least thirty-five years describes him as "a good and decent person" that is "loving, caring and compassionate."  (Ex. 13, Letter to Court from W. Smith.)

> b.  <u>Mr. Flowers is a hard working employee.</u>

President of The Best Service Company, Mr. Todd Shields, describes Mr. Flowers as "one of the hardest working, most diligent, and thoughtful individuals that I have had the pleasure of working with.  He is a true professional and an expert in our specific field."  (Ex. 17, Letter to Court from T. Shields.)  In addition to being a good employee, he has witnessed "many selfless acts that he has performed for the benefit of his co-workers . . . he frequently identifies areas of improvement that benefit his co-workers as well as our organization as a whole." (*Id.*)  Mr. Shields describes Mr. Flowers as "an asset to our organization and frankly, he is irreplaceable."  (*Id.*)

A co-worker, Olevia D. Edwards, describes Mr. Flowers' thoughtfulness to his co-workers:  "Michael is a real gentleman and has a personable and thoughtful spirit.  It is not unusual for him to pick up donuts for the entire office for no reason.  Michael makes sure all of the clerks in the office are remembered on their birthday, Valentine's Day and Christmas with flowers, candy and special gifts unique to each individual."  (Ex. 9, Letter to Court from O. Edwards.)  Ms. Edwards goes on to say, "he is an individual that I am proud to have known and I hope to stay in touch with because the world needs more people like Michael Flowers." (*Id.*)

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

MICHAEL FLOWERS' SENTENCING BRIEF

1    Mr. Brian Nelson is Assistant General Counsel of the Best Service company
2    and directly supervises Mr. Flowers.  He describes Mr. Flowers as a "uniformly . .
3    . hard working and effective member of my team.  He is frequently the first to
4    bring to my attention legal and factual issues . . . his attention to detail in insuring
5    that we are compliant with the law at all times in highly valued."  (Ex. 7, Letter to
6    Court from B. Nelson.)  Mr. Nelson goes on to state that Mr. Flowers is "a reliable
7    and hardworking person, who is a great asset to our company."  (*Id.*)

8    Ms. Lucy Mercado has worked with Mr. Flowers for nine years and
9    describes him as "an honest, hardworking man that deeply cares about his friends
10   and coworkers."  She believes that Mr. Flowers was instrumental in getting her
11   promoted to Supervisor and notes that "he never hestitates to vouch for anyone
12   that he knows deserves recognition for their efforts and hard work . . . he treats
13   everyone with utmost respect, he is the ultimate gentleman."  (*Id.*)  On a personal
14   level she notes that Mr. Flowers "has been very generous and has always
15   contributed to my children's school and sport fundraisers." (*Id.*)

16   Veronica Rowl describes Mr. Flowers as a "fellow co-worker that has
17   turned into a great friend and mentor."  (Ex. 11, Letter to Court from Veronica
18   Rowl.)  Ms. Rowl admires Mr. Flowers not only for his mentoring of young men
19   in their community, but his ability to do his job of collecting, while at the same
20   time "negotiate[ing] with debtors so that they can still pay their debt and still
21   provide for their families." (*Id.*)  Ms. Rowl describes Mr. Flowers as "a man of
22   high integrity, high moral values as well as an asset to his community."  (*Id.*)

23           c.      Mr. Flowers is a mentor that is committed to his community.

24   Longtime friend, Ms. Thea Williams, describes Mr. Flowers as "not only a
25   friend, but he has been my mentor.  Michael is genuine in his work ethics and his
26   commitment in the community."  (Ex. 14, Letter to Court from T. Williams.) She
27   goes on to note that Mr. Flowers is a great role model for the young and elderly in
28   their community.  (*Id.*)  Ms. Williams notes that while Mr. Flowers was President

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

15.

of  Los Angeles Black Pride, the organization sponsored toy drives, back to school giveaways, job fairs, fed and clothed the less fortunate and visited senior citizen homes.  (*Id.*)  Ms. Williams became President when Mr. Flowers stepped down, and said "he taught me how important it is to give back to the community, to help the youth & seniors."  (*Id.*)  In her opinion, "[w]ithout Michael's commitment to our community, things will fall between the cracks."  (*Id.*)

Mr. Norris-Yatta notes that Mr. Flowers "has been a valuable member/advocate in the promotion of LGBT rights in the City."  (Ex. 8, Letter to Court from R. Norris-Yatta.)  Paul Scott, President of Los Angeles LGBT pride "witnessed Mr. Flower's un-wavering care for an underserved and often rejected community."  (Ex. 12, Letter to Court from P. Scott.)  Mr. Scott believes that the Los Angeles LGBT's annual event to foster stronger community bonds and help improve quality of life for the LGBT community would not have been possible without the leadership of Mr. Flowers. (*Id.*)  It was not until Mr. Scott worked with Mr. Flowers that he "got the chance to full appreciate his tenacity, generosity and thoughtfulness."  (*Id.*)

2. *Mr. Flowers' Non-Malicious Motive (And Good-Faith Ignorance of the Law) Supports Probation*

Section 3553(a)(1) directs sentencing courts to consider the "nature and circumstances" of the offense, and particularly the "culpability of the offender," *Dorsey v. United States*, 567 U.S. 260, 294 (2012), in fashioning an appropriate sentence, *United States v. Hack*, 443 F. App'x 304, 305 (9th Cir. July 18, 2011) (indicating that "nature and circumstnaces" analysis included intent.)  A defendant's motive is highly relevant at sentencing.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Mahan*, 232 F. App'x 796, 799 (10th Cir. May 16, 2007) (vacating and remanding for resentencing because court refused to consider the defendant's stated motive for possessing a gun); *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting

16.

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1   substantial variance because "defendant did not take the bank's money out of
2   greed or a desire to live a lavish lifestyle; rather, he misguidedly tried to keep a
3   sinking business afloat"); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D.
4   Wis. 2005) ("defendant's culpability was mitigated in that he did not act for
5   personal gain or for improper personal gain of another" and noting that emphasis
6   on loss amount in white collar cases is a poor measure of personal culpability).

7       This is clearly not the typical bribery case, and Mr. Flowers is not the
8   typical bribery defendant.  There is no doubt that Mr. Flowers' conduct was
9   wrong, but his relationship with the public official in this case is an important
10  factor to consider because it is highly relevant to Mr. Flowers' motive.  Mr.
11  Flowers is guilty of federal bribery because he provided something of value—
12  money—as a reward to a state public official who provided Mr. Flowers with
13  information that was of value to Mr. Flowers—quarterly wage information.  Mr.
14  Flowers' "source" for the quarterly wage information—the state official—is a
15  longtime friend of over twenty-five years.  Mr. Flowers started paying for the
16  information because he wanted to compensate his friend for his time, and because
17  Mr. Flowers is a generous person, as numerous character letters attest.  Of course,
18  whether Mr. Flowers thought it was the right thing to do or not, or whether he was
19  motivated by generosity in paying for the information, Mr. Flowers broke the law.

20      Since this investigation began, Mr. Flowers has come to realize that by
21  rewarding his friend for such information, Mr. Flowers clearly violated the federal
22  bribery statute.  But Mr. Flowers' ignorance of the law—that paying for the
23  information was illegal—is something that can be easily corrected without the
24  need to send Mr. Flowers to prison.  Mr. Flowers understands exactly what he did
25  wrong and will never again come close to crossing the line again.

26      Further, a custodial sentence would be at odds with the goal of general
27  deterrence.  In its consideration of general deterrence, the Court should consider
28  the need to incentivize people to step forward and move towards redemption, as

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

17.

Mr. Flowers did in this case by accepting responsibility and helping the government secure a large restitution award against PCC. *See United States v. Stern*, 590 F. Supp. 2d 945, 956 (N.D. Ohio 2008) ("Respect for the law is promoted by punishments that are *fair*. . . not those that simply punish for punishment's sake.").

### 3. Mr. Flowers' Efforts Brokering Agreements With the Government and Agreeing to the Government's Loss Theory Supports Probation

The Guidelines in this case are what they are (27-33 months) specifically because Ms. Flowers agreed to the government's loss theory that, in turn, allowed the government to recover nearly one million dollars from PCC.

Mr. Flowers accomplished two significant feats for the government. First, as the government recognizes in the plea agreement, Mr. Flowers "broker[ed] agreements with [PCC] and others." Plea Agreement ¶ 4(e). What this means is that Mr. Flowers helped the government secure a conviction as to PCC, which was a significant accomplishment for the government, which of course is focused on the deterrent effects of convictions. Second, Mr. Flowers helped the government secure $946,770 in restitution from PCC by agreeing to the government's theory of loss, even though that theory is admittedly imperfect under the facts of this case.

The government's theory of loss is rooted in the conclusion that **<u>all</u>** of Mr. Flowers' collections over the relevant time period were the result of information he received from his friend, the Arizona state official. Thus, the government's view is that Mr. Flowers's entire collection efforts during the relevant time period were tainted by poisonous information, and total the $946,770 that the government then claimed was subject to forfeiture. Notably, neither side can meaningfully correlate specific collection results to specific cases where information came from Mr. Flowers' friend. Nonetheless, Mr. Flowers agreed to that number to avoid

18.

trial because he cannot both accept responsibility, which he wanted to do, and proceed to trial.

For the plea agreement, the government extrapolated from $946,770 the ten percent commission that Mr. Flowers received on all of his collection efforts, and declared "loss" to be the $94,677 commission that Mr. Flowers received rather than the approximate $30,000 Mr. Flowers paid.

Whether it is properly labeled "cooperation" or not, Mr. Flowers' efforts in working with the government to resolve this case warrants considerable attention for sentencing purposes. "[C]riminal justice today is for the most part a system of pleas," *Lafler v. Cooper*, 132 S. Ct. 1376, 1381 (2012), in which cooperation plays an essential function. "[B]ecause rewards for assistance are essential to the business of detecting and punishing crime," *United States v. Brigham*, 977 F.2d 317, 318 (7th Cir. 1992), courts have consistently honored cooperation—even if imperfect—with significantly reduced sentences. A defendant's cooperation may be included as part of consideration of the section 3553(a) factors. *United States v. Ressam*, 679 F.3d 1069, 1091 & n.10 (9th Cir. 2012); *accord United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (disagreeing with government's conclusion that the defendant did not provide extensive cooperation and recognizing that "use of a defendant's cooperation to justify significant variances or departures from the otherwise applicable Guidelines calculations is commonplace").

In the plea agreement, the government recognizes that Mr. Flowers' cooperation warrants a two-level downward variance in this case (allowing for Mr. Flowers to ask for a greater variance). Mr. Flowers respectfully requests that under section 3553(a), the Court consider Mr. Flowers' extensive cooperation and the value he brought to the government as an additional reason that Mr. Flowers should be sentenced to a term of probation rather than a prison term.

19.

### III.

### <u>CONCLUSION</u>

For the foregoing reasons, Mr. Flowers respectfully requests that the Court sentence him to probation, to include 200 hours of community service.

Dated:  May 15, 2018                     Respectfully submitted,

                                        SPERTUS, LANDES & UMHOFER, LLP


                         By:    /S James W. Spertus
                                James W. Spertus
                                Samuel A. Josephs
                                Attorneys for Michael Flowers

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

## DECLARATION OF SAMUEL A. JOSEPHS

I, Samuel A. Josephs, state and declare as follows:

1.      I am an attorney at Spertus, Landes & Umhofer, LLP, counsel of record for Michael Scott Flowers in this matter.  I am licensed to practice in the State of California, and admitted to practice before this Court.

2.      Attached as **Exhibits 1-17** are seventeen character reference letters submitted in support of Mr. Flowers.

3.      Attached as **Exhibit 18** is an excerpt from Amendment to the Sentencing Guidelines (Preliminary), dated April 12, 2018.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing facts are true and correct to the best of my information and belief.

Executed on May 15, 2018, at Los Angeles, California.

/S Samuel A. Josephs
Samuel A. Josephs

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

DECLARATION OF SAMUEL A. JOSEPHS

# EXHIBIT 1

EXHIBIT 1

# Gerald L. Banks

4122 Somerset Drive, #2, Los Angeles, CA 90008-3453 - 323-792-4854 - gerald2627@att.net

January 31, 2018

Honorable S. James Otero
United States District Court Judge
United States Courthouse, 350 W. 1st Street
Courtroom 10C
Los Angeles, CA 90012

Dear Judge Otero:

I am a retired corporate office healthcare employee, assistant to a Senior Vice President. I have known Michael Flowers for almost 30 years. Over the years I have enjoyed the pleasure of friendship that included sharing in religious worship services and choir singing as well as community social events, fundraisers and charitable work such as feeding the homeless.

I feel honored to write this "Character Letter" because Michael, although not perfect, has earned my respect. This respect stems from my personal observation of his conduct when interacting with people from all walks of life and treating them all the same.

As a latent deaf person I can vouch for his good character on a personal level as his kindness and patience exceeded that of even some of my closest family members when I became deaf. Not once has he allowed my disability to become a burden nor an embarrassment to him in social settings as he has remained the same and shown that my disability is not a problem. To a deaf person THAT MEANS A LOT.

From our talks I am convinced that Michael Flowers, by his own admission, regrets his past indiscretions and has learned a very valuable life's lesson, one that will never be repeated again.

I hold good thoughts that this letter will allow you to see the true nature of Michael Flowers that so many of us have come to know, respect and appreciate.

Sincerely,

Gerald L. Banks

# EXHIBIT 2

EXHIBIT 2

Honorable S. James Otero
United States District Court Judge
United States Courthouse, 350 W. 1st Street
Courtroom 10C
Los Angeles, CA. 90012


December 20, 2017


Dear Honorable Judge S. James Otero,

My name is Rahnee J. Cook.  I am a former manager at Health Advocates, a public advocacy
organization with an emphasis in assisting individuals to qualify Medi-Cal and Social Security
benefits, as well as providing central business office support for hospitals' revenue cycle.

Your Honor, I have known Michael Flowers for over thirty (30) years. We attended Southern
Christian College in Terrell, Texas, which is where we first met.  Michael is my best friend.  He
comes from a God- fearing family.  He was brought up by a strong, virtuous mother who worked
hard to provide Michael with all the resources available to construct Faith in God, honesty and
integrity in Michael's character.  I remember Michael helping a single mother struggling to work
and take care of her children while attending school at the same time.  Michael offered her baby
sitting help when she would get off work so her children would be cared for while she was in
school at night.  Michael did this for free, out of the benevolence in his heart.

 He is a person with values and a conscience who respects and upholds the law.  Michael
achieved the level of Eagle Scout in the Boy Scouts as a child growing up.  He was an original
member of the "The Little Angels", a Los Angeles California children's choir of The Figueroa
Church Of Christ.   They were featured on the radio every Sunday in the 1970's.  Michael
Flowers and his family were close to Kenneth Hahn, a member of the Los Angeles County Board
of Supervisors, as his mother worked on several supporting campaigns during the 1970's.
Michael is a stand up guy who will be there to support people in need and provide civic work
and support for a just cause.  Michael was the best man in my wedding in 1988 and has remained
a great friend to my wife, Valerie and myself to this day.  We are still married to each other.

Your Honor, I pray that the court will show leniency towards Michael Flowers.  This situation is
extremely out of character for Michael.  He has never been in trouble with the law and he is
absolutely not a lawless person.  I know this was an isolated incident and that he will never have
a recurrence, nor will he commit any other infraction of the law.

Michael is skilled in singing, music and working with people and children.  He would be
excellent at providing some type of community service, i.e., creating musical events and
exposing children and people of the community to the art of music through song.

I pray the Court will show mercy as this offense is out of character and not a true representation of  Michael Flower's true person and character.

Sincerely,

Rahnee J. Cook

# EXHIBIT 3

EXHIBIT 3

CARMELO DESHIELDS                                    2/18/18

4901 STENTON AVE # 318

PHILADELPHIA, PA 19144


Honorable S. James Otero

United States District Judge

United States Courthouse, 350 w 1st ST

Courtroom 10C

Los Angeles, Ca 90012


Dear Honorable S. James Otero,

My name is Carmelo DeShields. I am writing this letter in reference to a case that is

Before your court. This case is pertaining to a friend of mine, Michael Flowers.

I've known Michael Flowers since the summer of 1994. Michael Flowers is the kind of

person who opens his self to people selflessly. I lived in Las Vegas and he lived in Los

Angeles. He introduced me to many wonderful people who are still friends on mine

to this day.

During this time the aids epidemic was spreading wide and strong. So strong that I

Contracted it. When I told Michael that I was infected, he went back to Los Angeles

And did extensive research on the disease and brought it to me to read.

After a couple of years we slowly drifted apart. Even though we were drifting apart,

Michael was still by my side. Towards the end of 2012 I became deathly ill with the virus.

Michael took it upon himself to come to Vegas, pick me up and move me to Los Angeles
To live with him and took care of me. That was when he became my sole care giver. While
caring for me he dealt with my aids related dementia, loss of physical control of my body,
and pneumocystis carinii pneumonia ( PCP )  and many other aids related issues.

Soon I became so sick that he had to take me to the VA hospital, where I was admitted for
A total of 6 weeks. Michael visited me every day faithfully. When the doctors finished my
Evaluation and told Michael I had 3 to 6 weeks to live, he contacted my mother and flew
her to Los Angeles from Pennsylvania. And also she did not want for anything during her
stay with Michael.

After my release from the hospital, Michael flew me and my mother back home to
Pennsylvania where she took care of me.

I would also like to use this letter to thank Michael for caring so much about me that he
gave me the ability to have the life that I have now. If it wasn't for him I would not be alive to
write this letter.

Honorable S. James Otero, thank you for taking the time for seeing Michael flowers for the
person that I know him to be.

Truly Yours

# EXHIBIT 4

EXHIBIT 4

Catherine L. DeShields, BHUS/BA

70 S 3rd Ave Apt 402

Coatesville, PA 19320

Honorable S. James Otero

United States District Court Judge

United States Courthouse, 350 W. 1st Street

Courtroom 10C

Los Angeles, CA 90012

Dear Honorable S. James Otero,

Your Honor, I am writing this letter to you in regards to Michael Flowers. I have known Michael for about 25 years. Although Michael is not a part of my biological family, he is very dear to me and I think of him as my son. He calls me Mom and has helped me and my family in many ways.

Michael is an honorable person. He would not knowingly be a part of anything that is against the law or illegal. Michael would give the shirt off his back to help someone in need. Michael has always been honest and truthful to everyone and expects the same thing in return. I find him very trustworthy and sincere.

Following is an example of how Michael has helped me and my family:

Michael has a genuine concern for me and my family. He helped take care of my daughter and her two children when they moved to Las Vegas to be with her brother, Mel. She has returned to PA, leaving Mel alone.

Michael literally bent over backwards to help my son (Mel) who became very sick and was living alone in Las Vegas. Michael rented a car, drove to Vegas, picked up my son and took him back to Los Angeles where he proceeded to take care of him and tried to nurse him back to health. Only when Michael could no longer take care of my son because his health continued to deteriorate did he contact me. Michael paid for my round trip airplane ticket to Los Angeles, CA, once so that I could be with Mel and get him to the Veterans hospital so he could get better. The second time Michael paid for me to go back out to LA to see about transferring Mel to the VA hospital in Coatesville, PA where I live. Michael even paid for both Mel and myself to return to PA, plus gave Mel a few dollars to help him through the transition from one state to another. My son, thanks to Michael Flowers, is now well enough to live alone again and is doing great. There are no words to express how grateful I am to Michael.

I have heard many stories about how Michael has helped other families when they were in need. I hope he will be permitted to continue doing good for other families as well.

1

Thank you, Your Honor, for taking time out of your busy schedule read my letter about a very special person. Michael Flowers is a person who I consider more than a friend, someone who puts others needs and wants ahead of his own.

Best regards,

Catherine L. DeShields

# EXHIBIT 5

EXHIBIT 5

**M E M O R A N D U M**

To:          Honorable S. James Otero, United States District Court Judge
             United States Courthouse, 350 West 1st Street, Courtroom 10C
             Los Angles, California 90012

Date:        February 23, 2018

Subject:     Character Letter for Michael Flowers

Your Honor:

Michael Flowers is a childhood friend and Christian brother of mine.  Our relationship dates back to the 1970's.  We were introduced to one another by our parents at the Figueroa Church of Christ, in Los Angeles, California.  We further shared a common interest in chorus singing.  During that time period, I have watched Michael participate in several benevolent activities taking food to the elderly, singing at charitable events, and visiting the sick members of our congregation.  Michael was one of the section leaders, who trained the younger boys to learn their song parts.  As a young adult, Michael attended Southwestern Christian College, where he continued to participate in choral singing while study Christian history.  From 1980 thru 1988 we both sang with the Figueroa Church of Christ Angelic Chorus.

Michael has a long exposure to Christian training; and he is a very sincere person.  I truly believe that if you were to grant him mercy, Michael will learn from this mistake and he will not repeat these infractions.  My belief is that Michael will remain a law adhering citizen of the United States.

My name is Garvin Glass; and I a Government Regulations Manager for Ford Motor Company, with over 18 years of service.  I am so an active member of the University Church of Christ in Cleveland, Ohio.

Garvin Glass

# EXHIBIT 6

EXHIBIT 6

Honorable S. Jameson Otero
United States District Court Judge
United States Courthouse
350 W. 1st Street, Courtroom 10C
Los Angeles, CA 90012

February 9, 2018

My name is Lucy Mercado, I'm the senior paralegal (supervisor) at Law Offices of Clark Garen (salaried employees of The Best Service Company). I first met Michael Flowers in August of 2009 when I resumed my employment at the Law Offices of Clark Garen after a medical leave of absence. Michael was working as a legal department collector and I soon began working closely with him because my first assignment was to assist with completion of post judgment recovery paperwork.

Michael Flowers and I share a similar work ethic, we have spent many long days in the office trying to get as much work done, and many times are the last ones to leave the office. He has been the top grossing collector at our organization due to his strong work ethic and knack for reviewing our debtor's accounts and being able to identify the ones that have viable assets that most of the time prove to be fruitful when attempting to recover the debt. He also assists other collectors in our organization and I have witnessed him give them valuable advise to improve their collection efforts.

I believe Michael was instrumental in getting me promoted to the Supervisor position I now hold with the company. He has always been very vocal with our boss about all the hard work that I have put in to improve our department. He never hesitates to vouch for anyone that he knows deserves recognition for their efforts and hard work. Michael always treats the paralegal staff members with much gratitude because he knows that their work is conducive to his collection recoveries. He treats everyone with utmost respect, he is the ultimate gentleman.

Michael and I have developed a friendship that extends outside of work and he has met my husband and children. My husband is very fond of Michael because he knows he is a very respectful, hardworking gentleman. Michael has been very generous and has always contributed to my children's school and sport fundraisers. He regularly asks me about my families' well-being, which to me solidifies his genuine care for them.

When I learned about Michael's alleged involvement with the criminal justice system I was left speechless. I could not believe that he would be involved in the alleged activities. Your Honor, I believe that Michael's involvement with the criminal justice system is completely out of character and I do not believe that this is something that would ever happen again. Michael is an honest, hardworking man that deeply cares about his friends and coworkers. I know Michael is not a selfish person that would do anything reckless that could result in harm to any other person. His love for life is evident in his ability to bring a smile to everyone he meets.

Respectfully,

Lucy Mercado
7416 Walnut Ave
Paramount, CA 90723

# EXHIBIT 7

EXHIBIT 7

Honorable S. James Otero
United States District Court Judge
United States Courthouse
350 W. 1st St.
Courtroom 10C
Los Angeles, CA 90012

Dear Judge Otero,

My name is Brian Nelson. I am an attorney licensed in the States of California and Texas, and I am admitted to appear before all the District Courts of California, and the 9th and 11th Circuit Courts of Appeals. I have been the Assistant General Counsel of The Best Service Company for a year and four months. I supervise the day to day operation of our legal team.

During that period, I have directly supervised Michael Flowers in his capacity as a legal collector for The Best Service Company. My experience with Michael is that he has uniformly been a hard working and effective member of my team. He is frequently the first to bring to my attention legal and factual issues that may indicate issues with an account. His attention to detail in insuring that we are compliant with the law at all times is highly valued.

I do not feel that Michael is in any way likely to have further issues with the criminal justice system. It is frankly out of his general character. During the year that I have known him, my impression of him is as a reliable and hardworking person, who is a great asset to our company.

Brian Craig Nelson
SBN 220716

# EXHIBIT 8

EXHIBIT 8

# Robert Norris-Yatta

1111 Veltre Cir SW
Atlanta, Georgia 30311

February 19, 2018

The Honorable S. James Otero
United States District Court
United States Courthouse
350 W. 1st Street
Courtroom 10C
Los Angeles, California 90012

     Re:   Michael Flowers

Dear Judge Otero:

I am Robert Norris-Yatta, a retired legal secretary living in Atlanta, Georgia.  I have known
Michael since 1968 where I served as the youth choir director for the Figueroa Church of Christ
for well over 20 years.  Michael was active in the choir from the early age of 8 until he graduated
from Lynwood High school in 1979.  After he returned from attending Southwestern College in
Terrell, Texas, which his grandfather was a founding member, he became an active and faithful
member in the choir once again.  I must admit, he was one of the best tenors in the choir as well
a singer I could always rely on; even on short notices whether the choir was performing for a
U.S. President, City Hall function through the Honorable Kenneth Hahn's office, or major
television productions.

During Michael's childhood, I became very fond of him and his family which included his
mother and 2 sisters… oftentimes brunching with them after Sunday services.  Michael's mother,
Ruby Flowers, was an outstanding citizen of Los Angeles and was always noted for her gifts to
society in the fields of nursing and teaching as noted in Who's Who of American Women year
after year during her lifetime.  This was the beginning of my bonding closer to Michael, literally
seeing myself as somewhat of a big brother, father-like figure in his life which is where our
relationship stands and is deeply grounded today.

Michael grew up in a home where there was no father.  His mother passed away when he was 17
or 18.  During this grief-stricken moment, I never once heard him complain.  But in that moment,
he made me very proud as I watched him step into manhood and accept the responsibilities that
lie within.  And most importantly, I saw the beginnings of the true Michael Flowers that exists
today… a hard and dedicated worker on any job he undertakes and a man of compassion and
deep spiritual convictions of Christianity.  He is also a man that has always shown a great respect
of law and order.  Unlike so many of the young men of his age that grew up in the Southwest Los
Angeles, Compton, Carson area (where Michael grew up), his morals and civil responsibilities to

his community were challenged but never defeated.  And while, perhaps, some of his dreams may have been deferred, he kept marching as any brave soldier would.

Michael, since childhood, has always had a very kind and loving personality as exemplified in his smile of compassion.  Yet looking deeper into his smile, one will find a man of integrity, a strong willed, and truthful man of courage and conviction.  He is a man that has always exhibited excellent leadership abilities.  I have never seen or heard of him not seeing a project through completion that he commits himself to whether it be personal, religious or a community-based volunteer program.  To the best of my knowledge, and with no secrecy, he has been a valuable member/advocate in the promotion of LGBT rights in the City.  He always keeps me aware of his life's events through our weekly conversations.

As I have not lived in Los Angeles for 20 years or so and have aged to 70 years, Michael, for years, has seen that communications between us never stops, whether it be by visits to Atlanta or phone calls.  His interest in me as I've approached the autumn of my life touches my heart immensely.  There have been times, after my retirement (truthfully known as a "50+ year employees must go layoff"), where I have not been able to afford my monthly mortgage and necessary medication for my survival.  Without Michael's help, I cannot fathom how I would have made it.  And still today, if there is a need, Michael is here.  Yet, I should not be surprised by this act of kindness as he always showed respect and gave assistance to the elderly members of his church family, the Figueroa Street Church of Christ, since his early childhood years.

Strangely, as I write this letter, I feel this isn't truly in real time being that this ordeal that I'm addressing is so un-characteristically Michael.  I can truly say that once this blemish is behind him, I do not expect the criminal justice system to ever see him again under any of its lenses.  It is my belief that Michael's future deeds to any church, charitable cause or community-based program, which is his history, will soon bury this chapter of his life.

I would like to thank the Court for granting me the opportunity to share my thoughts on Michael.  In so many ways, I feel that I know him best.  And, perhaps, my letter may seem selfish because of what Michael has done and does for me and others, my prayer to the court is that he not be judged completely by this one issue that he now faces, but rather judge the man by his overall character.  A character that has stood the test of good citizenship for over 50 years; a character that exemplifies a heart of love for mankind and a giving soul to the many who have no voices; a character who tries to obey God and the laws of mankind above all.

Humbly submitted with a prayer of leniency to the Court,

I am

Robert Norris-Yatta
1111 Veltre Cir SW
Atlanta, Georgia 30311
(404) 272-3900

# EXHIBIT 9

EXHIBIT 9

OLEVIA D. EDWARDS
2401 W. 101ST STREET
INGLEWOOD, CA  90303
323-697-0779
oleviaedwards@gmail.com

February 5,  2018


James W. Spertus and Samuel A Josephs
Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90023


RE:  Michael Flowers


Dear Sirs,

I have enclosed a character letter on behalf of Michael Flower, please do not
hesitate to contact me if necessary at 323-697-0779 or email
oleviaedwards@gmail.com


Sincerely,

Olevia D. Edwards


Enclosure

OLEVIA D. EDWARDS
2401 W. 101ST STREET
INGLEWOOD, CA 90303
323-697-0779
oleviaedwards@gmail.com

February 5, 2018

Honorable S. James Otero
United States District Court Judge
United States Courthouse
350 W 1st Street
Los Angeles, CA 90012

RE: Michael Flowers

Dear Sir,

I am pleased to write this character letter on behalf of Michael Flowers.

I met Michael Flowers in April 2012 during the merger of The Best Service Co Inc. (TBSC) and Professional Collection Consultant (PCC). He was a long time employee of PCC. During this transitional period, Michael was helpful and made every effort to make me and the entire Best Service staff feel welcome. He shared his knowledge without hesitation and was always ready to help make the experience as stress free as possible.

Michael is a real gentleman and has a personable and thoughtful spirit. It is not unusual for him to pick up donuts for the entire office for no reason. Michael makes sure all of the clerks in the office are remembered on their birthday, Valentine's Day and Christmas with flowers, candy and special gifts unique to each individual. I have been in the work environment for a number of years, this is a first for me.

As of December 28, 2017, I retired from the company and no longer inter-act with Michael on a daily basis. I can say without a doubt, he is an individual that I am proud to have known and I hope to stay in touch with because the world needs more people like Michael Flowers.

Respectfully,

Olevia D. Edwards

# EXHIBIT 10

EXHIBIT 10

# STERLING RICE
# OAKLAND, CALIFORNIA

## (323) 251-0181

LDUAN817@GMAIL.COM

February 19, 2018

Honorable S. James Otero
United States District Court Judge
United States Courthouse, 350 West 1st Street
Courtroom 10C
Los Angeles, CA 90012

Re:  Michael Flowers

Your Honor:

My name is Sterling Rice.  I am currently working in the Bay Area as an Access Driver for the elderly and the physically challenged.  I have known Michael for approximately eight years.

Michael Flowers came into my life at a time when I was jumping out on faith and trying something new and daring! Coming from Cincinnati, Ohio, and knowing absolutely nothing about California, and no one in Los Angeles! Michael held out his hands and took me into his awesome heart and home.  He gave me somewhere to live! He gave me my first job in California! He helped me get my driver's license for the first time and my very first car. He taught me how to manage money and how to think on a more spiritual, professional and business level!

Michael showed me the value of community service and introduced me to others who were disciplined and would advance my level of thinking on a spiritual level.

I never had a father figure, but I now know why they call them Godparents! Because only God could have known me so well to know exactly what I was missing! And I know it was this amazing man I call My Dad, Michael Flowers.

I ask this Court to please be considerate in Michael's sentencing.

Thank you.

Respectfully yours,

Sterling Rice

# EXHIBIT 11

EXHIBIT 11

February 12, 2018

Honorable S. James Otero
United States District Court Judge
United States Courthouse, 350 W. 1st Street
Courtroom 10C
Los Angeles, CA  90012

      Re: Michael S. Flowers

To the Honorable S. James Otero,

I have worked with Michael S. Flowers for 2 ½ years and during that time he has been an inspiration to both my personal and professional growth.  Mr. Flowers always has a positive, upbeat attitude as well as many words of wisdom.  He is a fellow co-worker that has turned into a great friend and mentor.

I was in total admiration when I found out that Mr. Flowers was a mentor for young men.  Mr. Flowers cares a lot about the fate of young men and takes them under his wings to help guide them with the many challenges they may face in life.  It takes a special person to keep the attention of our youth and Mr. Flowers is that person.  He is a great communicator and orator; an asset to our community.

Mr. Flowers is a successful and smart businessman who made a wrong decision in his career.  Mr. Flowers is not a man of ill-will and he would never do anything to harm or bring harm to an individual.  I have personally heard calls in which Mr. Flowers negotiates with debtors so that they can still pay their debt and still provide for their families. Mr. Flowers has a generous heart and is very well respected within the office and amongst the legal staff.

I hope this court is able to look beyond its file and see the true essence of Mr. Flowers.  Mr. Flowers is a man of high integrity, high moral values as well as an asset to his community.

Sincerely,

Veronica A. Rowl

# EXHIBIT 12

EXHIBIT 12

February 20 2018

**Honorable S. James Otero**
United States District Court Judge
United States Courthouse, 350 W1st Street
Courtroom 10C
Los Angeles, CA 90012

Dear Sir:

My name is Paul Scott and I served as President of Los Angeles LGBT pride. It is in that capacity I got to know Mr Micheal Flowers. First hand I witnessed Mr Flower's un-wavering care for a underserved and often rejected community.

Mr Flower's is considered to be a positive figure and elder in community. However, it's not until I worked side by side with Mr flowers that I got the chance to fully appreciate his tenacity, generosity and thoughtfulness.

For more than 20 years Los Angeles has successfully had an annual event designed to foster stronger community bonds and help improve the overall quality of life for an underserved community. This annual event would not have been possible without the leadership of Mr. Flowers.

Please consider that Mr Flowers transgressions in this matter are very surprising and out of character as I've got to know him. Mr Flower's age and his obvious understanding of the rule of law makes is equally surprising that he would find himself at this crossroad.

I request that it to be taken into consideration Mr Flower's many good and consistent works.

Furthermore, as a US Navy Veteran that served in Iraqi I know how mistakes can cost lives I hope Mr. Flowers transgressions do not rise to that level thereby haveing the opportunity for redemption.

Should you have any questions please feel free to contact me.

Sincerely

Los Angeles LGBT Pride Movement

Paul Scott
Director

# EXHIBIT 13

EXHIBIT 13

9309 W. Riverwoods Dr.
Milwaukee, WI 53224

February 17, 2018

Honorable S. James Otero
United States District Court Judge
United States Courthouse, 350 W. 1st Street
Courtroom 10C
Los Angeles, CA 90012

       Re: <u>Character Letter</u>

My name is William Smith and I am a retired detective from the Milwaukee Police Department (2011). I'm writing this letter on behalf of my friend, Michael Flowers whom I have known for approximately 35 years or more. We met in college in Texas and became close friends to the point that Michael moved to Milwaukee and lived with my family while he continued his education.

Our common bond is that we are brethren in the Church of Christ. We have kept in contact over the years and I know Michael to be a good and decent person. His grandfather, G. P. Stewart was a renowned minister in the Church of Christ. Michael grew up in a spiritually rich religious family.

Like sometimes will tempt us and causes us to make mistakes if we give in to those temptations. It seem that this is what happened in his case. I know Michael to be a loving, caring and compassionate person. He has always been an up standing law abiding citizen. I know he regrets the decision he made in this case.

I know Michael deeply regrets the decision he made in this case that has caused him to be here today to face punishment for his actions. I asked the court to look at the character of this man and bestore mercy and grace upon him in sentencing.

Thank you for time.

Sincerely,

*William C. Smith*

# EXHIBIT 14

EXHIBIT 14

Honorable S. James Otero

United States District Court Judge

United States Courthouse 350 W.1st Street

Courtroom 10C

Los Angeles, CA. 90012


I have had the privilege of knowing Michael Flowers over 30 years. Michael is not only a friend but he has been my mentor. Michael is genuine in his work ethics and his commitment in the community.

Michael Flowers was President of Los Angeles Black Pride "Pride & Promote". Michael has received awards from the City of Los Angeles, Maxine Waters and other county officials. Michael is a great role model for our youth and elderly in the community.

When Michael was President we had a lot of Community Events.

E

We sponsored Toy Drives. Back to School giveaways, Job Fairs, feedings and clothing for those less fortunate and we spent special days visiting Senior Citizen homes. When Michael stepped down, I became President. He has been my mentor. He has taught me how important it is to give back to the community, help the youth & seniors.

I know Michael is a law-abiding citizen. This man deserves another chance. Without Michaels commitment to our community, things will fall between the cracks.

I honestly believe there will NEVER be any further involvement with the criminal justice system after he fulfills his responsibilities in this case.

Michael made a huge mistake and I believe in my heart, he learned from this mistake.


If you need any further information feel free to contact me:

Thank you in advance for your consideration!!!

Thea Williams

(323) 788-6744

# EXHIBIT 15

EXHIBIT 15

**LORRAINE YORKE**
**946 SOUTH CLOVERDALE AVENUE**
**LOS ANGELES, CALIFORNIA 90036**
**(323) 857-0061**

LYORKE8@GMAIL.COM

February 11, 2018

Honorable S. James Otero
United States District Court Judge
United States Courthouse, 350 West 1st Street
Courtroom 10C
Los Angeles, CA 90012

Your Honor:

I am Lorraine Yorke. I have been working in the legal field in Los Angeles since 1968, and as a paralegal through February, 2017.

I have known Michael Flowers for approximately 25 years. We met through his sister, Gwendolyn Flowers, whom I met while vacationing in Jamaica in the 1980's. Michael and I have been living together for the past four years.

Although he did not have to, and without my asking, Michael offered to live with and help me with my mortgage so that I may retain my home which would not have been possible due to the mortgage meltdown.

The above is just one of the major positive characteristics that make Michael an outstanding individual in the Community. I have personal knowledge of and have spoken with at least one person whose life he has literally saved by physically, emotionally and financially caring for..

Additionally, there are many others in the Community who have benefitted from Michael's generosity in the past, and yet others whom he is continuously helping. I also know of many of his other acts of kindness, both charitable and educational, to some he does not even know personally. He is always willing to instruct, inform and give, including my large family, of which he is an integral part.

As noted, Michael is a one-of-a-kind human being for whom I ask Your Honor to give special consideration in this matter. Of notable importance is the fact that without his presence in my life at this time, it would certainly be a great burden if not impossible for me to live alone. He is my confidante and is always there for me mentally, emotionally and physically.

Honorable S. James Otero
United States District Court Judge
February 11, 2018
Page Two


      This situation in which Michael is involved is quite out of character for him.  I honestly believe that whatever wrong he did, he probably was once again attempting to "do some good" for others without any thought of the harm he would bring upon himself.  His favorite saying is always:

***"It's never about me."***

I am convinced that after this incident Michael will definitely have no further negative involvement with the criminal justice system.

      We need Michael in our Community, Your Honor, so I beseech you to be quite lenient in your sentencing.

      Thank you, Your Honor.

                          Respectfully yours,

                          Lorraine Yorke

# EXHIBIT 16

EXHIBIT 16

**ROLAND YORKE**
**CONSULATE GENERAL OF BELIZE**
**4801 WILSHIRE BOULEVARD, SUITE250**
**LOS ANGELES, CALIFORNIA 90010**

**(323) 634-9900 -- (213) 507-2455**

CGRYORKE@YAHOO.COM

February 11, 2018

Honorable S. James Otero
United States District Court Judge
United States Courthouse, 350 West 1st Street
Courtroom 10C
Los Angeles, CA 90012

Your Honor:

I am Roland Yorke. I have been the Consul General of Belize for the Western Region of the United States since 2007.

For the past 15 years I have known Michael Flowers. We met through my sister, Lorraine Yorke. It was as a consequence of my close relationship with my sister that I got to know him. Through this connection, I have personal knowledge of his assistance to my sister and the Belizean community.

As a community organizer, I am always involved in fundraising . It just seemed natural to approach Michael because I knew we could rely on him for his support because of his ongoing willingness to participate in the Belizean fundraising and other functions for the betterment of the Belizean community in Los Angeles. I have also attended a few of his fundraising functions for various organizations of which he has been a part.

Michael is a kind and generous individual and a pleasure to be around. I consider him to be an integral part of both my family and the Belizean community. We need more people like Michael in our Community at large.

The above are just a few of the major positive characteristics that make Michael an outstanding individual in the Community. He is always a willing to help in any capacity when I am around him.

I do not see Michael as an individual who would have knowingly been involved on the wrong side of the criminal justice system, and I do believe he has learned from this experience and has closed that chapter in his life.

Honorable S. James Otero
United States District Court Judge
February 11, 2018
Page Two


      May I plead for Your Honor's leniency with regards to Michael Flowers.

      Thank you.


                             Respectfully yours,

                             Roland Yorke
                             Consulate General of Belize

# EXHIBIT 17

EXHIBIT 17

February 21, 2018

Honorable S. James Otero
United States District Court Judge
United States Courthouse, 350 W. 1st Street
Courtroom 10C
Los Angeles, CA 90012

RE:        Michael Flowers

Dear Judge Otero,

I am one of the owners and the President of The Best Service Company. Mr. Flowers has worked for me since February 2006, over 12 years. I was introduced to Mr. Flowers by a colleague that he had worked under for many years. My colleague provided a very excellent employment recommendation which led to my hiring Mr. Flowers.

Over the course of the twelve (12) years working with Mr. Flowers, I have become very familiar with his character. Mr. Flowers is one of the hardest working, honest, most diligent, and thoughtful individuals that I have had the pleasure of working with. He is a true professional and an expert in our specific field.

In addition to being a true professional, over the years I have witnessed many selfless acts that he has performed for the benefit of his co-workers. He has not only demonstrated that he cares about his personal job performance, he very frequently identifies areas of improvement that benefit his co-workers as well as our organization as a whole. Michael has always demonstrated his interest in following rules, policies, and procedures. He is truly an asset to our organization and frankly, he is irreplaceable.

In addition to the business relationship that we have built over the past 12 years, Michael and I have also developed a friendship which I hold in the same high regard. Michael is not only an amazing employee, he is thoughtful, caring human being.

Thank you for your time and allowing me the opportunity to provide my support for Mr. Flowers at this time.

Sincerely,

Todd Shields

# EXHIBIT 18

EXHIBIT 18



# Amendments to the Sentencing Guidelines (Preliminary)

# April 12, 2018

This document collects the amendments to the sentencing guidelines, policy statements, and commentary in the unofficial, "reader-friendly" form in which they were made available at the Commission's public meeting on April 12, 2018. As with all amendments that the Commission has voted to promulgate but has not yet officially submitted to Congress and the Federal Register, authority to make technical and conforming changes may be exercised and motions to reconsider may be made. Once the amendments have been submitted to Congress and the Federal Register, official text of the amendments as submitted will be posted on the Commission's website at www.ussc.gov and will be available in a forthcoming edition of the Federal Register. In addition, an updated "reader-friendly" version of the amendments will be posted on the Commission's website at www.ussc.gov.

**PROPOSED AMENDMENT:**             **ALTERNATIVES TO INCARCERATION**
                                    **FOR NONVIOLENT FIRST OFFENDERS**

**Synopsis of Proposed Amendment:** This proposed amendment is a result of the Commission's continued study of alternatives to incarceration. *See* U.S. Sentencing Comm'n, "Notice of Final Priorities," 82 FR 39949 (Aug. 22, 2017).

The *Guidelines Manual* defines and allocates sentencing options in Chapter Five (Determining the Sentence). This chapter sets forth "zones" in the Sentencing Table based on the minimum months of imprisonment in each cell. The Sentencing Table sorts all sentencing ranges into four zones, labeled A through D. Each zone allows for different sentencing options. Zones A and B provide for the following options:

> *Zone A.*—All sentence ranges within Zone A, regardless of the underlying offense level or criminal history category, are zero to six months. A sentencing court has the discretion to impose a sentence that is a fine-only, probation-only, probation with a confinement condition (home detention, community confinement, or intermittent confinement), a split sentence (term of imprisonment with term of supervised release with condition of confinement), or imprisonment. Zone A allows for probation without any conditions of confinement.

> *Zone B.*—Sentence ranges in Zone B are from one to 15 months of imprisonment. Zone B allows for a probation term to be substituted for imprisonment, contingent upon the probation term including conditions of confinement. Zone B allows for non-prison sentences, which technically result in sentencing ranges larger than six months, because the minimum term of imprisonment is one month and the maximum terms begin at seven months. To avoid sentencing ranges exceeding six months, the guidelines require that probationary sentences in Zone B include conditions of confinement. Zone B also allows for a term of imprisonment (of at least one month) followed by a term of supervised release with a condition of confinement (*i.e.,* a "split sentence") or a term of imprisonment only.

The proposed amendment amends the Commentary to §5C1.1 to add a new application note stating that if the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment. For purposes of this application note, a nonviolent first offender is a defendant who has no prior convictions or other comparable judicial dispositions of any kind and who did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense of conviction. This new application note accords with 28 U.S.C. § 994(j), which provides that the guidelines should reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense.

In addition, the proposed amendment amends the Commentary to §5F1.2 (Home Detention) to remove the language instructing that (1) electronic monitoring "ordinarily should be used in connection with" home detention; (2) alternative means of surveillance may be used "so

long as they are as effective as electronic monitoring;" and (3) "surveillance necessary for effective use of home detention ordinarily requires" electronic monitoring.

Finally, the proposed amendment makes conforming changes to other provisions in Chapter 5.

**Proposed Amendment:**

---

## §5C1.1.   Imposition of a Term of Imprisonment

\* \* \*

**Commentary**

**Application Notes:**

1.  Subsection (a) provides that a sentence conforms with the guidelines for imprisonment if it is within the minimum and maximum terms of the applicable guideline range specified in the Sentencing Table in Part A of this Chapter. For example, if the defendant has an Offense Level of 20 and a Criminal History Category of I, the applicable guideline range is 33–41 months of imprisonment. Therefore, a sentence of imprisonment of at least thirty-three months, but not more than forty-one months, is within the applicable guideline range.

2.  Subsection (b) provides that where the applicable guideline range is in Zone A of the Sentencing Table (*i.e.*, the minimum term of imprisonment specified in the applicable guideline range is zero months), the court is not required to impose a sentence of imprisonment unless a sentence of imprisonment or its equivalent is specifically required by the guideline applicable to the offense. Where imprisonment is not required, the court, for example, may impose a sentence of probation. In some cases, a fine appropriately may be imposed as the sole sanction.

3.  Subsection (c) provides that where the applicable guideline range is in Zone B of the Sentencing Table (*i.e.*, the minimum term of imprisonment specified in the applicable guideline range is at least one but not more than nine months), the court has three options:

    (A)   It may impose a sentence of imprisonment.

    (B)   It may impose a sentence of probation provided that it includes a condition of probation requiring a period of intermittent confinement, community confinement, or home detention, or combination of intermittent confinement, community confinement, and home detention, sufficient to satisfy the minimum period of imprisonment specified in the guideline range. For example, where the guideline range is 4–10 months, a sentence of probation with a condition requiring at least four months of intermittent confinement, community confinement, or home detention would satisfy the minimum term of imprisonment specified in the guideline range.

    (C)   Or, it may impose a sentence of imprisonment that includes a term of supervised release with a condition that requires community confinement or home detention. In such case, at least one month must be satisfied by actual imprisonment and the remainder of the minimum term specified in the guideline range must be satisfied by community confinement or home detention. For example, where the guideline range is 4–10 months, a sentence of imprisonment of one month followed by a term of supervised release with a

2

condition requiring three months of community confinement or home detention would satisfy the minimum term of imprisonment specified in the guideline range.

The preceding examples illustrate sentences that satisfy the minimum term of imprisonment required by the guideline range. The court, of course, may impose a sentence at a higher point within the applicable guideline range. For example, where the guideline range is 4–10 months, both a sentence of probation with a condition requiring six months of community confinement or home detention (under subsection (c)(3)) and a sentence of two months imprisonment followed by a term of supervised release with a condition requiring four months of community confinement or home detention (under subsection (c)(2)) would be within the guideline range.

4.  If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3). *See* 28 U.S.C. § 994(j). For purposes of this application note, a *"nonviolent first offender"* is a defendant who has no prior convictions or other comparable judicial dispositions of any kind and who did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense of conviction. The phrase "comparable judicial dispositions of any kind" includes diversionary or deferred dispositions resulting from a finding or admission of guilt or a plea of *nolo contendere* and juvenile adjudications.

4̶5.  Subsection (d) provides that where the applicable guideline range is in Zone C of the Sentencing Table (*i.e.*, the minimum term specified in the applicable guideline range is ten or twelve months), the court has two options:

(A)  It may impose a sentence of imprisonment.

(B)  Or, it may impose a sentence of imprisonment that includes a term of supervised release with a condition requiring community confinement or home detention. In such case, at least one-half of the minimum term specified in the guideline range must be satisfied by imprisonment, and the remainder of the minimum term specified in the guideline range must be satisfied by community confinement or home detention. For example, where the guideline range is 10–16 months, a sentence of five months imprisonment followed by a term of supervised release with a condition requiring five months community confinement or home detention would satisfy the minimum term of imprisonment required by the guideline range.

The preceding example illustrates a sentence that satisfies the minimum term of imprisonment required by the guideline range. The court, of course, may impose a sentence at a higher point within the guideline range. For example, where the guideline range is 10–16 months, both a sentence of five months imprisonment followed by a term of supervised release with a condition requiring six months of community confinement or home detention (under subsection (d)), and a sentence of ten months imprisonment followed by a term of supervised release with a condition requiring four months of community confinement or home detention (also under subsection (d)) would be within the guideline range.

5̶6.  Subsection (e) sets forth a schedule of imprisonment substitutes.

6̶7.  There may be cases in which a departure from the sentencing options authorized for Zone C of the Sentencing Table (under which at least half the minimum term must be satisfied by imprisonment) to the sentencing options authorized for Zone B of the Sentencing Table (under which all or most of the minimum term may be satisfied by intermittent confinement, community confinement, or home detention instead of imprisonment) is appropriate to accomplish a specific

3

treatment purpose. Such a departure should be considered only in cases where the court finds that (A) the defendant is an abuser of narcotics, other controlled substances, or alcohol, or suffers from a significant mental illness, and (B) the defendant's criminality is related to the treatment problem to be addressed.

In determining whether such a departure is appropriate, the court should consider, among other things, (1) the likelihood that completion of the treatment program will successfully address the treatment problem, thereby reducing the risk to the public from further crimes of the defendant, and (2) whether imposition of less imprisonment than required by Zone C will increase the risk to the public from further crimes of the defendant.

**Examples:** The following examples both assume the applicable guideline range is 12–18 months and the court departs in accordance with this application note. Under Zone C rules, the defendant must be sentenced to at least six months imprisonment. (1) The defendant is a nonviolent drug offender in Criminal History Category I and probation is not prohibited by statute. The court departs downward to impose a sentence of probation, with twelve months of intermittent confinement, community confinement, or home detention and participation in a substance abuse treatment program as conditions of probation. (2) The defendant is convicted of a Class A or B felony, so probation is prohibited by statute (*see* §5B1.1(b)). The court departs downward to impose a sentence of one month imprisonment, with eleven months in community confinement or home detention and participation in a substance abuse treatment program as conditions of supervised release.

7~~8~~. The use of substitutes for imprisonment as provided in subsections (c) and (d) is not recommended for most defendants with a criminal history category of III or above.

8~~9~~. In a case in which community confinement in a residential treatment program is imposed to accomplish a specific treatment purpose, the court should consider the effectiveness of the residential treatment program.

9~~10~~. Subsection (f) provides that, where the applicable guideline range is in Zone D of the Sentencing Table (*i.e.*, the minimum term of imprisonment specified in the applicable guideline range is 15 months or more), the minimum term must be satisfied by a sentence of imprisonment without the use of any of the imprisonment substitutes in subsection (e).

\* \* \*

## §5F1.2.   Home Detention

Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment.

### Commentary

**Application Notes:**

1.  "***Home detention***" means a program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs, and such other times as may be specifically authorized. Electronic monitoring is an appropriate means of surveillance ~~and ordinarily should be used in connection with~~ for home

detention. However, alternative means of surveillance may be used ~~so long as they are as effective as electronic monitoring~~ if appropriate.

2.    The court may impose other conditions of probation or supervised release appropriate to effectuate home detention. If the court concludes that the amenities available in the residence of a defendant would cause home detention not to be sufficiently punitive, the court may limit the amenities available.

3.    The defendant's place of residence, for purposes of home detention, need not be the place where the defendant previously resided. It may be any place of residence, so long as the owner of the residence (and any other person(s) from whom consent is necessary) agrees to any conditions that may be imposed by the court, *e.g.*, conditions that a monitoring system be installed, that there will be no "call forwarding" or "call waiting" services, or that there will be no cordless telephones or answering machines.

**Background:** The Commission has concluded that ~~the surveillance necessary for effective use of home detention ordinarily requires~~ electronic monitoring is an appropriate means of surveillance for home detention. However, in some cases home detention may effectively be enforced without electronic monitoring, *e.g.*, when the defendant is physically incapacitated, or where some other effective means of surveillance is available. Accordingly, the Commission has not required that electronic monitoring be a necessary condition for home detention. Nevertheless, before ordering home detention without electronic monitoring, the court should be confident that an alternative form of surveillance ~~will be equally effective~~ is appropriate considering the facts and circumstances of the defendant's case.

In the usual case, the Commission assumes that a condition requiring that the defendant seek and maintain gainful employment will be imposed when home detention is ordered.

\* \* \*

---

## §5H1.3.   Mental and Emotional Conditions (Policy Statement)

\* \* \*

In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose. *See* §5C1.1, Application Note ~~6~~7.

\* \* \*

---

## §5H1.4.   Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction (Policy Statement)

\* \* \*

In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose. *See* §5C1.1, Application Note ~~6~~7.

\* \* \*