1 NICOLA T. HANNA
  United States Attorney
2 LAWRENCE S. MIDDLETON
  Assistant United States Attorney
3 Chief, Criminal Division
  ELISA FERNANDEZ (Cal. Bar No. 172004)
4 Assistant United States Attorney
  Public Corruption & Civil Rights Section
5      1X00 United States Courthouse
       312 North Spring Street
6      Los Angeles, California 90012
       Telephone: (213) 894-7383
7      Facsimile: (213) 894-0681
       E-mail:   elisa.fernandez@usdoj.gov
8
  Attorneys for Plaintiff
9 UNITED STATES OF AMERICA

10                 UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12 UNITED STATES OF AMERICA,          No. CR 17-732-SJO

13        Plaintiff,                  GOVERNMENT'S POSITION RE
                                      SENTENCING OF DEFENDANT MICHAEL S.
14            v.                      Flowers

15 MICHAEL S. Flowers,                Hearing Date: May 29, 2018
                                      Hearing Time: 9:00 a.m.
16        Defendant.

17

18      Plaintiff United States of America, by and through its counsel

19 of record, the United States Attorney for the Central District of

20 California and Assistant United States Attorney Elisa Fernandez,

21 hereby files the Government's Position Re Sentencing of Defendant

22 Michael S. Flowers.

23      This Government's Position Re Sentencing of Defendant Michael S.

24 Flowers is based upon the attached memorandum of points and

25 authorities, the files and records in this case, and such further

26 evidence and argument as the Court may permit.

27

28

1 | Dated: May 17, 2018

Respectfully submitted,

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


          /s/
ELISA FERNANDEZ
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.     INTRODUCTION**

3          On December 8, 2017, defendant Michael S. Flowers ("defendant"

4   or "Flowers") pled guilty to a single-count Information, which also

5   named corporate defendant Professional Collection Consultants

6   ("PCC").   Count One charged Flowers and PCC with conspiring to commit

7   federal program bribery in violation of 18 U.S.C. § 371.   Flowers

8   admitted that for a least three years he and others paid money to

9   Coconspirator 1, an employee and agent of the Arizona Department of

10  Economic Security ("DES"),[1] in exchange for obtaining "Confidential

11  Information" from federal and state databases. The Confidential

12  Information passed to PCC, through Flowers, consisted of employer,

13  quarterly wage and unemployment insurance information for individual

14  Social Security numbers ("SSNs").   Flowers was an employee and agent

15  of PCC.   Flowers used the confidential information to analyze the

16  collectability of debts owed to PCC or which PCC was assigned to

17  collect.   From at least January 1, 2013 through August 27, 2013, the

18  confidential information obtained by Flowers through Coconspirator 1

19  assisted PCC's efforts to collect $946,770 in debts owed.   PCC paid

20  Flowers a commission of $94,677; which equaled ten percent of the

21  collections Flowers brought in through the scheme from January 1,

22  2013 through August 27, 2013.

23          The government respectively requests that the Court impose a

24  low-end custodial sentence within the range of 18 to 15 months --

25

26          _____

27          [1] At all times relevant to the Information, DES was an agency of
    the government of the State of Arizona that provided unemployment
    insurance ("UI") benefits. (PSR ¶ 14.)   DES received in excess of
28  $10,000 in federal funds during each one-year period from at least
    January 1, 2010 through December 31, 2013. (PSR ¶ 20.)

1  based on a total offense level of 17, a two-level downward variance

2  and a criminal history category of I, not II.

3  **II.   STATEMENT OF FACTS**

4      **A.    The Offense Conduct**

5      Defendant Flowers admitted that on or before September 1, 2010,

6  and continuing to at least August 27, 2013, PCC and others conspired

7  to corruptly give Coconspirator 1, an agent of a State agency, money

8  in exchange for the non-public Confidential Information for specific

9  SSNs.  (PSR ¶¶ 1-16.)  During the scope of the conspiracy,

10 codefendant PCC operated as a debt collection company in California.

11 Flowers was employed as a debt collector at PCC. (PSR ¶ 9.)  Flowers'

12 responsibilities included determining the collectability of debts

13 serviced by PCC by searching massive public and private/proprietary

14 (pay for use) databases to locate debtors1 addresses and publically

15 available information about each debtors' financial resources.  (*Id*.)

16      From at least 2006 through August 27, 2013, Coconspirator 1 was

17 employed by and acted as an agent of the Arizona Department of

18 Economic Security ("DES")[2], an agency of the government of the State

19 of Arizona that provided unemployment insurance ("UI") benefits. (PSR

20 ¶ 10.)  DES maintained unemployment data, wage and earning

21 information, and processed UI benefits using an information system,

22 which was linked with federal and state databases that contained

23 Confidential Information for individuals in all fifty states. (*Id*.)

24 As an employee and agent of DES, and in his role as a public

25

26

27 _____

28      [2] Flowers stipulated that DES received in excess of $10,000 in
   federal funds during each one-year period from at least January 1,
   2010 through December 31, 2013.  (*Id*.)

1    official, Coconspirator 1 had access to federal and state databases

2    that contained locate Confidential Information.  (*Id*.)

3         Flowers gave Coconspirator 1 cash in return for Coconspirator 1

4    disclosing, without authorization, Confidential Information. (PSR ¶

5    11.)  Flowers, PCC and others conspired to pay, and paid,

6    Coconspirator 1 money in exchange for Coconspirator 1 providing

7    Confidential Information to Flowers.  (*Id*.)  From September 2, 2010

8    through August 16, 2013, at a bank branch located in California,

9    Flowers deposited bribe payments in the form of cash deposits into a

10   bank account controlled by Coconspirator 1.  (PSR ¶ 12; Exhibit 5.)

11   Typically, Flowers deposited the bribe payments as follows:  in 2010

12   and 2011; $500 once a month; in 2012, $500 twice a month; and, in

13   2013, $500 two or three times a month. (*Id*.)  Flowers received

14   payments from PCC and others for the Confidential Information

15   provided by Coconspirator 1.  (*Id*.)  For every fifty SSNs for which

16   Flowers obtained quarterly wage information per employer from

17   Coconspirator 1, PCC paid Flowers $500. (*Id*.)  Intending to benefit

18   PCC and others, Flowers used a portion of those payments to pay

19   Coconspirator 1 for the Confidential Information. (*Id*.)

20        Flowers and others searched PCC's servers in order to identify

21   and generate lists of SSNs of individuals owing money on accounts

22   serviced by PCC. (PSR ¶ 13; Exhibits 1 and 7.)  Flowers sent

23   Coconspirator 1 lists of debtors' SSNs via facsimile, text and email.

24   (*Id*.)  Coconspirator 1 then accessed federal and state databases to

25   determine whether an employer had reported wage and employer

26   information for each SSN. (*Id*.)  Coconspirator 1 sent Flowers

27   Confidential Information for each SSN. (PSR ¶ 13; Exhibits 2, 6-7.)

28

1  If the databases had no Confidential Information, Coconspirator 1

2  advised Flowers that "no wages" existed for specified SSNs. (*Id.*)

3       The wage and earning information broken down by quarter,

4  employer and SSN, purchased from Coconspirator 1 was not available to

5  the public. (PSR ¶ 14.)  Flowers' payments to Coconspirator 1 enabled

6  PCC and others to obtain quarterly wage information per employer for

7  thousands of debtors several times a week for several years. (*Id.;*

8  Exhibit 2.)  Flowers used the Confidential Information to analyze the

9  collectability of each debtor's debt by using it to determine if a

10 debtor was employed, a debtor's employer(s) per quarter, a debtor's

11 wages and earnings per quarter, and a debtor's ability to pay the

12 debt owed. Flowers used the Confidential Information to determine

13 whether it would make financial sense for PCC and others to sue a

14 debtor in an effort to obtain a judgment and attach wages. (*Id.*)

15      From at least January 1, 2013 to 27, 2013, the Confidential

16 Information obtained by Flowers through Coconspirator 1 assisted

17 PCC's efforts to collect $946,770 in debts owed. (PSR ¶ 1-5.)  PCC

18 paid Flowers a commission of $94,677; which was, ten percent of the

19 collections brought in through the scheme during that time. (*Id.*)

20      In furtherance of the conspiracy, on April 17, 2013 Flowers sent

21 Coconspirator 1 an email referencing "NEW RUSH LIST DATED 4117113

22 MFlowers ALL STATES PRINT OUT" that provided SSNs for numerous

23 individuals, including an individual with SSN XXX-XX-6128

24 ("Individual A"). (PSR ¶ 16; Declaration of Elisa Fernandez and

25 attached Exhibits (hereinafter referred to as "Exhibit" or

26 "Exhibits"), Exhibit 1.)  On April 18, 2013, Flowers received from

27 Coconspirator 1 a facsimile.  (*Id.;* Exhibit 2.)  The fax referenced

28 "Mike Flowers Rush List (2nd) and providing quarterly wage and

1  earnings information per employer for Individual A. (*Id.*)  Flowers

2  and others caused to be entered in to PCC's database Confidential

3  Information for Individual A, including the comment "WRKS FOR

4  FENCING" along with Individual A's earnings as of the fourth quarter

5  of 2012. (*Id.;* Exhibit 3.)  On about April 18, 2013, as payment for

6  obtaining Confidential Information from coconspirator 1, from a bank

7  branch in California, defendant Flowers deposited $500 in cash into

8  Coconspirator l's JPMorgan Chase bank account. (*Id.;* Exhibit 5.)

9      **B.   Plea Agreement, Sentencing Guidelines & Criminal History**

10     Pursuant to a written plea agreement, the parties agreed to the

11  Sentencing Guideline factors set forth below.  (PSR ¶ 3.)  Pursuant

12  to the plea agreement, the government agreed to recommend a term of

13  imprisonment no higher than the low end of the applicable sentencing

14  guideline range.  (PSR ¶ 2.)  The government also agreed to recommend

15  a two-level downward variance to account for Flowers' role in

16  brokering agreements between PCC and the government.  (*Id.*)

17     The USPO and the parties concur with the following applicable

18  Sentencing Guidelines factors a base offense level of 12, + 2 for

19  multiple bribes, +6 for the value received by Flowers, - 3 for

20  acceptance of responsibility.  (PSR ¶¶ 20-30; Plea Agreement ¶ 12.)

21  The PSR applied a criminal history category II based on a 2009 DUI

22  conviction and defendant's commission of the instant offense while on

23  summary probation.  (PSR ¶¶ 34-38; Defense Sentencing Brief ("DSB")

24  at 6, fn. 1.)  Apart from the instant offense, defendant has no

25  convictions or arrests since 2009 (a DUI).  The 2009 conviction was

26  not a crime of violence, bribery or fraud.  While defendant committed

27  the instance offense "while under a criminal justice sentence"

28  summary probation, however, does not include supervision, guidance or

5

1  direction.  (*Id.*)  Based on these facts a criminal history category

2  II overstates the seriousness of defendant's criminal history.

3  **III. ARGUMENT**

4      **A.    Advisory Sentencing Guideline Calculation & Range**

5      The USPO and the parties concur that the applicable total

6  offense level is 17 based on a base offense level of 12, +2 for

7  multiple bribes, and +6 for the value received by Flowers

8  (commissions of $94,677), and -3 for acceptance of responsibility.  A

9  total offense level of 17 and a criminal history category of I,

10  yields a revised advisory sentencing guideline range of 24 to 30

11  months (instead of 27 to 33 with a criminal history category of II).

12      **B.    Full Consideration of All § 3553 Factors Warrant a Downward**

13                   **Variance of Two-Levels**

14      Defendant asserts that consideration of the factors set forth

15  under 18 U.S.C. Section 3553 warrant a substantial downward variance

16  from the sentencing guideline range of 27 to 33 months.  (PSR.)  In

17  sum, defendant requests a probationary sentence – or a variance of

18  more than 4 levels.  Full consideration of the factors set forth in

19  18 U.S.C. § 3553 warrants a downward variance of two levels for

20  defendant's role in brokering a plea agreement with PCC.  (PSR ¶ 3.)

21  A deeper downward variance based on this fact alone or in combination

22  with other Section 3553 factors is unwarranted.

23      Flowers' did <u>not</u> cooperate against anyone – <u>not</u> his employers,

24  <u>not</u> his supervisors, and <u>not</u> his coconspirators.  Flowers did <u>not</u>

25  record any conversations, did <u>not</u> wear a wire, did <u>not</u> testify before

26  a grand jury or other court proceeding, and did <u>not</u> proffer

27  information or evidence. Bank, payroll and personnel records showed

28  that Flowers earned a salary plus ten percent of all the collections

1   PCC made on his accounts – in eight months (January 1, 2013 through

2   August 27, 2013) PCC paid Flowers $94,677 in commission. (*Id.*)

3   Flowers admitted that the $94,677 was obtained from the commissions

4   earned on collections made with the assistance of information

5   provided by Coconspirator 1 – in other words Flowers received a value

6   of $94,677.  As an employee and agent of PCC, this factual admission

7   further cemented that during the same time frame, the information

8   provided by Coconspirator 1 assisted PCC in collecting $946,770 in

9   debts.  (*Id.*)  The government concurs that it can be difficult to

10  correlate precisely which actions brought about which collections.

11  Thus, a two-level downward variance properly accounts for defendant's

12  role in brokering a plea with PCC and agreements with others.

13       Contrary to defendant's assertion, the nature and circumstances

14  of the offense do not warrant a further downward variance.

15  Defendant's decision to pay a friend (a DES employee/co-conspirator

16  1) multiple cash bribes in order to corruptly influence and reward

17  the co-conspirator 1 to unlawfully provide Flowers and PCC with non-

18  public confidential information, that is, employer and quarterly wage

19  information, does not warrant a downward variance.  (PSR ¶ ¶ 16; Def.

20  Supp. Pos.)  Flowers paid Coconspirator 1 to obtain non-public

21  confidential information -- "employer and quarterly wage information

22  for thousands of debtors several times a week for several years."

23  (PSR ¶ 14.)  Defendant wanted the non-public employer and quarterly

24  wage information in order to analyze the collectability of PCC's

25  debt.  (PSR ¶¶ 9, 10, 13-14.)

26       Flowers incorporated the non-public confidential information

27  into PCC's electronic account systems and used it to "determine

28  whether it would make financial sense for PCC and others to sue a

1  debtor to obtain judgment and attach wages."  (*Id.*; Exhibits 3 and

2  11.) By integrating the confidential information into his and PCC's

3  business practices; Flowers and PCC were able to short cut

4  traditional debt collection practices.  (Exhibits 4, 9 10.)  While

5  "Flowers worked a lot," Flowers used "a contact [Coconspirator 1]"

6  "to find people."  (Exhibit 9 at 5.)  The contact "would provide

7  Flowers with debtors' employment information."  Unlike Flowers,

8  "other debt collectors were not able to locate a debtor's employment

9  information."  (*Id.*)  Flowers acted not out a desire to compensate

10  his friend for his efforts, but because the non-public confidential

11  information he purchased from Coconspirator 1 enabled Flowers to

12  "analyze the collectability of debts" and to decide where to invest

13  his time and PCC's resources into determining "whether it would make

14  financial sense for PCC and others to sue a debtor" in an effort to

15  collect.  (PSR ¶ 14.)  The bribery scheme generated collections for

16  PCC and commissions for Flowers.  "[T]he collector with the highest

17  collection totals was consistently Flowers."  ((Exhibit 9 at 5.)

18  "Flowers collected a quarter of all collections for the company."

19  "There was a huge gap between Flowers and the next best collector."

20  (*Id.*; Exhibit 10 at 4-5.)

21      Second, defendant's personal history and characteristics do not

22  warrant a substantial departure/variance from the advisory sentencing

23  guideline range.  (DSB 2.)  Flowers proffers multiple letters from

24  friends and colleagues that speak of his good character, kindness and

25  generosity.  (Def. Exhibits.)  Several reference letters do not

26  reveal whether the authors knew the nature (conspiracy to commit

27  federal program bribery), the extent (unlawfully obtaining

28  confidential information for thousands of debtors) or the duration of

8

1  the offense conduct (several years). (Def. Exhibit 1 ("regrets his

2  past indiscretions"); Exhibit 2 ("I know this was an isolated

3  incident)).  One letter states that Flowers is not likely to "repeat

4  these infractions." (Def. Exhibit 5.)  Defendant's repeated acts over

5  a sustained period of time and his integration of the unlawfully

6  obtained information into his business practices, however, suggest

7  differently.

8       Limited weight should be given to the letters submitted by Todd

9  Shields and Sterling Rice.  The President of The Best Service

10 Company,"[3] Todd Shields has employed Flowers since 2006 and states

11 that Flowers is hardworking, diligent, thoughtful and "honest."  (DSB

12 2; Def. Exhibit 17.)  Shields letter omits the fact that during the

13 offense conduct Shields owned PCC and served on its Board (President,

14 Chief Executive Officer and Vice President).  (Exhibits 10 and 12.)

15 Flowers and others mined PCC's debt collection records (servers) for

16 SSNs of thousands of debtors. (PSR ¶¶ 13-14; Exhibits 4, 9-10.)

17 Flowers and Shields made special requests for debtors' information –

18 e.g. SSNs, and amount owed, and collection status.  (Exhibit 9 at 5.)

19 Flowers "was only concerned with an individual's name, SSN, and

20 state."  (Exhibit 10 at 5-6.)  Flowers had others prepare debt

21 inventory sheets that included SSNs.  (Exhibits 9 and 10.)  Despite

22 confidentiality concerns, Shields authorized providing Flowers with

23 the information needed to create the debtor lists.  (Exhibits 4, 9 at

24 5, 10 at 5-6.)  On the debtor lists, Flowers placed notes such as "no

25 employment info – MF," but would "not account for how he obtained

26 such information."  (Exhibit 10 at 4-5.)  In contrast, other

27

28

---

[3] The Best Service Company is referred to as "Best" or "TBSC."

9

1    collectors added notes such as "searched accurint" or "called so and

2    so."   (Exhibit 10 at 6.) The Confidential Information received from

3    Coconspirator 1 was entered into PCC's databases. (PSR ¶¶ 13, 16;

4    Exhibit 11.)

5        Flowers is actively involved in Los Angeles' LGBT community.

6    (PSR ¶ 48; DSB 8, 11-19.)  He also has helped and counseled others.

7    (DSB 12.)  While commendable, these traits do not warrant a further

8    downward variance.  Sterling Rice while appreciative of Flower's

9    support and mentorship, fails to disclose that Flowers found him a

10   job at PCC inputting Confidential Information into PCC's serves.

11   (PSR ¶ 13; Exhibit 8.)  Government Exhibit 8 are copies of some of

12   the documents seized from Sterling Rice's desk at PCC.

13       Lastly, defendant, like many, experienced personal, economic and

14   emotional hardships.  (PSR ¶¶ 41-49.)  Defendant also had a

15   supportive extended family and the opportunity to become an Eagle

16   Scout and to attend college.  (PSR ¶¶ 44, 46; DSB 8-9, 41-49.)

17   **IV.   CONCLUSION**

18       With full consideration of the advisory sentencing guidelines,

19   the § 3553 factors and all available sentences, the government

20   respectfully requests the Court to find that a criminal history

21   category of I reflects the seriousness of defendant's criminal

22   history apply; to vary two-levels downward from the offense level of

23   17; and to impose a low-end custodial sentence within the revised

24   range of 18 to 24 months.

25

26

27

28

1                    DECLARATION OF ELISA FERNANDEZ

2       I, Elisa Fernandez, declare as follows:

3       1.   I am the Assistant United States Attorney currently

4  assigned to the matter United States v. Professional Collection

5  Consultants and Michael S. Flowers, CR 17-732-SJO.  I submit this

6  declaration in support of the government's Positon Re: Presentence

7  Report for Defendant Michael S. Flowers.

8       2.   Attached to this declaration as Exhibit 1 is a true and

9  correct copy of an email from defendant Michael S. Flowers's yahoo

10 account to the email of Coconspirator 1 with the subject "NEW RUSH

11 LIST DATED 4/17/13 MFLOWERS ALL STATES PRINT OUT."

12      3.   Attached to this declaration as Exhibit 2 is a true and

13 correct copy of a facsimile sent from co-conspirator 1 from a State

14 of Arizona, DES facsimile to defendant Flower's RingCentral Account

15 (602) 771-8000 which RingCentral converted to an email sent to

16 Flowers' yahoo account, which includes the handwritten notation "Mike

17 Flowers Rush List (2nd)."

18      4.   Attached to this declaration as Exhibit 3 are true and

19 correct copies of Accuterm screen prints of PCC's electronic debtor

20 account files pertaining to a debtor with a Social Security number

21 ending in 6128.

22      5.   Attached to this declaration as Exhibit 4 is a true and

23 correct copy of an FBI-302 of a May 18, 2015 Interview of Jeffrey T.

24 McGrath.

25      6.   Attached to this declaration as Exhibit 5 is a true and

26 correct copy a $500 deposit slip into Coconspirator 1's Chase bank

27 account.

28

7.    Attached to this declaration as Exhibit 6 are true and correct copies of photographs taken from a printer in Coconspirator 1's home.

8.    Attached to this declaration as Exhibit 7 are true and correct copies of photographs taken from a printer in Coconspirator 1's work station.

9.    Attached to this declaration as Exhibit 8 are true and correct copies of sheets containing quarterly wage and employer information corresponding to the Social Security numbers of several debtors that were seized from Sterling Rice's desk at PCC.

10.   Attached to this declaration as Exhibit 9 is a true and correct copy of an FBI-302 of a December 12, 2014 Interview of Shoichi Omoto.

11.   Attached to this declaration as Exhibit 10 is a true and correct copy of an FBI-302 of a March 19, 2014 Interview of Lisa McCann.

12.   Attached to this declaration as Exhibit 11 are true and correct copies of Accuterm screen prints of two PCC's electronic debtor account files with the hand written notations "PAID $500- 9-29-2011 TS" and "ALL OLD JUDGEMENTS PAID 9-15-2011 $500.00 TS."

13.   Attached to this declaration as Exhibit 12 is a true and correct copy are Statements of Information filed with the State of California, Secretary of State pertaining to Professional Collection Consultants, on September 19, 2014 and June 5, 2009 and listing Todd Shields as President and Chief Executive Officer and Vice President, respectively.

1    I declare under penalty of perjury under the laws of the United
2 States of America that the foregoing is true and correct and that
3 this declaration is executed at Los Angeles, California, on June 27,
4 2016.

5

6

7

8    _____
         ELISA FERNANDEZ
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13