# Exhibit 4

FD-302 (Rev. 5-8-10)　　　　　　　　-1 of 4-　　　　　　 OFFICIAL RECORD

UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**　　　Date of entry　05/20/2015

Jeffrey Thomas McGrath (McGrath), home address ▮▮▮▮▮▮▮▮▮▮, CA ▮▮▮ date of birth ▮▮▮▮▮, CA drivers license ▮▮▮ was interviewed by Federal Bureau of Investigation Special Agent (SA) Jeffrey M. Bartel and Department of Labor SA Cory Oravecz. After being advised of the identities of the SAs and the nature of the interview, McGrath provided the following information:

### Background

McGrath was not employed by Professional Collection Consultants, LLC (PCC) at the time of interview.

McGrath originally worked at PCC from 1986 to 1991. McGrath then went to work in the retail industry. McGrath was approached to return to PCC in September 2004. McGrath was asked to leave PCC in 2011 by Todd Shields (Shields), Owner of PCC and Gary Gamble (Gamble). McGrath was vocal about PCC policies and procedures and spoke out against the favoritism. For these reasons, McGrath felt he was let go.

McGrath was related to Shields and Donald Hopp (Hopp), another PCC owner. Shields was Hopp's step son and they seemed to have a good relationship. Shields was McGrath's cousin. McGrath no longer had a relationship with that side of the family and had not spoken to them, including Shields since he left PCC.

### PCC

A. Legal Department

McGrath started as a debt collector in 2004 and moved to the legal department in 2006/2007. Gamble was McGrath's supervisor in the legal department. According to McGrath, Gamble did not have a law degree and was not employed as PCC's in-house counsel. The attorney for PCC was Scott Wu.

UNCLASSIFIED//FOUO

Investigation on 05/18/2015 at El Segundo, California, United States (Phone)

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮▮　　　　　　　　　　　Date drafted 05/18/2015

by JEFFREY M BARTEL

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PCC066455

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  Jeffrey McGrath interview  , On  05/18/2015 , Page  2 of 4

While in the legal department, McGrath handled the writs of execution which included billing and interest for the debtors. Once McGrath completed his work, the debtors' file went to other employees within PCC for their specialties. Once the debtors' documents, including the writ of execution, were completed by PCC, a local Court or Sheriff's department served the writ. Following the writ's service, an acknowledgement of the writ would be returned to PCC.

B. Debt Collector

McGrath made phone calls and did computer work with debtors' files which included credit checks and skip tracing to find out debtor information.

McGrath never went to a debtor's house.

C. Mike Flowers

Mike Flowers (Flowers) received debtor's information from other sources.

McGrath was shown bates numbered document PCC-67 which he recognized as Flowers.

Flowers received debtor information with only a SSAN provided. McGrath did not know how Flowers received his information but he did know Flowers somehow faxed debtors SSAN's and sent it to somebody. People at PCC talked about Flowers' process (of getting debtor information) in the office. Even Flowers was open about how he was able to get information. Gamble and Shields said Flower's would contact his "source." In meetings, Shields and Gamble would ask if Flowers had called his "source."

McGrath was shown bates numbered document PCC-1004. McGrath said the document's information looked familiar, however; he had not seen it in the current format. The comments section of the debtors account had the same information. Any updated information was input into the PCC's system in regards to the debtor but McGrath was not sure who input the data.

McGrath later stated he did not know how Flowers sent the information to his "source" but the information was received via fax. McGrath saw the faxes come into Flowers' mailbox at PCC.

McGrath was shown bates numbered document PCC-1003 which he recognized as how Flowers received the information from his "source" via fax.

McGrath stated there was a good chance other debt collectors could use Flowers to get information.

UNCLASSIFIED//FOUO

PCC066456

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  Jeffrey McGrath interview  , On  05/18/2015 , Page  3 of 4

McGrath did not know who Flowers' source worked for.

McGrath thought Flowers was hired because management knew Flowers had a "source." There was talk around the office that Flowers paid his source because there was no legal means to obtain the information that Flowers received. According to McGrath, it was logical that Flower's paid his "source."

McGrath rarely saw Flowers on the phone which was how collectors would get their information legally.

Flower's was able to get information on "dead accounts" which were accounts that someone could not legally get any information on.

When monthly numbers collected on debtors were released, Flowers would boast about how high his numbers were.

**Miscellaneous**

Flowers had private meetings with Shields and other managers. Other debt collectors would have similar meetings but Flowers' meetings were significantly more frequent.

McGrath felt Flowers' conduct was unethical and illegal. It was illegal to McGrath because the proper way to skip trace was not possible with Flowers work ethic (or lack there of) and how he was able to obtain the information.

Flowers reported directly to Shields and Gamble.

McGrath did not know Flowers' salary or commission percentage.

McGrath heard conversations between Shields, an attorney and PCC supervisors approximately three to four times asking if something should be run through Flowers' "source."

McGrath never heard Gamble or Shields talk about paying Flowers' "source."

McGrath never heard Shields paid Flowers extra money for his "source."

It appeared to McGrath that Gamble or Shields did not have any issues with Flowers having a "source."

PCC employees were frustrated with what Flowers was doing.

PCC employees did not know why some policies applied to everyone except

UNCLASSIFIED//FOUO

PCC066457

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  Jeffrey McGrath interview  , On  05/18/2015  , Page  4 of 4

Flowers (i.e. coming and going as one pleased).

Joe Perez (Perez) and Tonya Jones (Jones) were collections supervisors. McGrath saw Perez and/or Jones in meetings with Shields, Gamble and Flowers.

There was no known policy to McGrath that PCC employees could not share personal identifying information with personnel outside of PCC.

There were always debtor files in Gamble's and Shields' office.

McGrath was not a supervisor at PCC.