# Exhibit 9

FEDERAL BUREAU OF INVESTIGATION

Date of entry 02/18/2014

Shoichi Omoto, born [REDACTED], [REDACTED] social security account number (SSAN) [REDACTED] residing at [REDACTED], California 90603, cell phone number [REDACTED] home phone number [REDACTED] was interviewed. Present during the interview were FBI Special Agent (SA) Alex Esconde, Department of Labor Office of Inspector General (DOL-OIG) SA Cory Oravecz, and Assistant United States Attorney (AUSA) Elisa Fernandez. After being advised of the official identities of the interviewing agents, Omoto provided the following information.

Omoto was advised that this interview was completely voluntary, and was free to stop the interview and leave at any time.

Omoto indicated that he did not bring counsel to the interview.

Omoto began working for "[REDACTED] a third party debt collection company, in approximately July 1999 as the Director of Technology. His duties at TBSC included managing information technology (IT) and information security, and facilities management. In 2008, when the economy went down, TBSC downsized, and Omoto also managed subordinates as well.

In March 2013, Professional Collection Consultants (PCC), also a third party Debt-collection Company, purchased TBSC. At this time, TBSC moved their offices from the Westwood/Santa Monica area to the PCC building at [REDACTED]ve., Los Angeles, CA.

Omoto was fired from PCC on 01/25/2014. Omoto was cut a paycheck that day and was not paid for any days subsequent to 01/25/2014. Omoto advised that he knew he would be fired from PCC. Omoto felt PCC President, Todd Shields (Shields) was doing things to get Omoto into a position to be fired. Approximately three to four months after the PCC/TBSC merger, Shields decided to move TBSC's collection database onto the PCC collection database platform. Also, at the beginning of transition, Shields had Omoto train someone on the legacy PCC side on database tasks that Omoto normally handled for the TBSC server. These actions would cut the need for Omoto's position.

Investigation on 02/12/2014 at Los Angeles, California, United States (In Person)

File # [REDACTED] Date drafted 02/14/2014

by ESCONDE ALEX

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Mike Nickaulas (Nickaulas) was the software consultant, who managed PCC's collection database. Nickaulas was based out of Apple Valley, and rarely came onsite to PCC. Omoto recalled that Nickaulaus only visited PCC approximately two times during Omoto's tenure at PCC.

MultiPoint, a company in Beverly Hills, CA., also provided IT consultation to PCC. MultiPoint provided all other IT support to PCC, which were not handled by Nickaulas, to include user management, networking, and e-mail support. Brian Bloom is the President of MultiPoint. Matt Flannigan is the MultiPoint point of contact who work closely with PCC.

Prior to December 2013, MultiPoint used an external server to house PCC's e-mail. In December 2013, e-mail storage was moved to an internal server within PCC. All stored e-mails are cumulative, and all pre-transition e-mails would have been brought onto the new server. To the best of Omoto's knowledge, PCC has not destroyed any e-mail during his time with the company. Omoto was unsure if the Microsoft Exchange e-mail data was stored on the same server as the collection data.

There were some problems bringing pre-transition e-mails of some legacy TBSC employees onto the new server. Omoto, as well as some other legacy TBSC employees in human resources (HR) and accounting did not have pre-transition e-mails brought to the new server by MultiPoint. Omoto was able to personally upload a backup copy of his old e-mails on the new server. Omoto made this backup copy of approximately one month prior to the transition. There were no problems transitioning any of the other legacy TBSC employees.

Omoto only had a TBSC e-mail account, and did not have a PCC e-mail account.

When Omoto left PCC in January 2014, PCC had just finished transitioning their collection database onto a new server. The old server, as well as the new server, were housed in PCC's server room, located on the third floor, northeast corner, of the PCC building.

PCC is regulated by the banking industry to keep their collection data for a minimum 15 years. As a matter of company practice, Shields also keeps all of PCC's emails. The banking industry does not set requirements for e-mail retention.

PCC records all phone calls in and out of PCC.

Shields held administrative rights on the PCC/TBSC server, and could look at anyone's data. On PCC's server, he held the highest access. Shields had remote access to the server. Others who had remote access to the

server were Omoto, MultiPoint and Nickaulas.

Omoto advised that Shields reads his employees e-mails. Omoto had heard from others at PCC, that the PCC's previous IT manager was monitoring Shields e-mails, and had gotten into his personal data. Omoto did not know the name of the previous IT manager, however, advised that Jenny Calderon (Calderon) and Michele Aquino (Aquino), PCC's disputes clerk, would know his identity. Calderon had left PCC in approximately 2013. Omoto advised that Calderon had told Aquino about the previous IT manager looking into Shields personal information. Aquino had then told Omoto this information.

Shields had read Omoto's emails prior to his last day at PCC. In Omoto's emails, he had sent an e-mail to someone stating that he was going to a data conference after a dentist appointment on January 22, 2014. On January 22, 2014, Shields had scheduled a mock month end. Omoto called in sick on January 22 to go to the dentist and then the data conference. When Omoto came back to work the next day, Shields had a termination letter drafted which stated Omoto had abused the sick day policy by going to the data conference.

The collection server backup procedures differ for PCC and TBSC. Currently, PCC uses a cloud-based backup server, managed by MultiPoint, to backup their collection database. Prior to changing server hardware in December 2013, PCC backed up their data nightly on tape drives. Shields and Joe Perez (Perez) would alternate taking daily backup tapes home. This was done in order to prevent data loss in case something happened at the PCC building. Omoto advised this practice was against bank policy. Even though the backups were encrypted, the banks did not want PCC officials to transport personal identifying information of their customers. The banks preferred that a third-party service be used for transport and storage of any backup media.

Omoto told Shields that it was against bank policy to transport and store the confidential information of their clients. Shields advised Omoto to continue to with the process. Omoto advised that the backups were garbage without the encryption key, which was stored on the backup server. Without the decryption key, there was no way to decrypt the drives and access its files.

Prior to moving the TBSC collection server onto the PCC platform, TBSC backed up their hardware nightly on removable hard drives. Shields would have Omoto make a daily backup of the TBSC collection database. After Omoto made a backup, he would put the drive in the top flap of Shields briefcase for shields to take home that night. Omoto would then take the previous days drive out of Shields briefcase to be used for the following

days backup. Shields had a "Swiss Army" satchel type briefcase. Omoto made secondary backups of TBSC's server, which he took home on a nightly basis. Omoto also recycled drives for this process.

At this point in the interview, Omoto was shown an e-mail, dated August 20, 2013, from Todd Shields to multiple recipients, to include Tonya Jones. Omoto advised that that e-mail would have been housed offsite. Additionally, the e-mail would have been stored on the sender's and recipients local machine.

Shields business e-mail accounts were todd@tbsc.la and todd@pcc.crs.com.

Shields has a personal Yahoo account. Omoto advised that Shields may have sent Omoto e-mails from his personal Yahoo account to Omoto's TBSC e-mail account. Prior to TBSC moving to the PCC building, Shields and Omoto had sent e-mails back and forth. Omoto felt that Shields used his personal Yahoo account for some of these conversations, but couldn't be sure.

Sterling Rice (Rice), and Michael Flowers (Flowers) did not have PCC or TBSC e-mail accounts. Not all collectors had office emails.

Flowers used a personal yahoo account. Omoto advised that Flowers would ask Omoto regularly how to use his computer to access Flowers' personal e-mail account, as well as websites needed for skip tracing such as Lexis Nexus.

Omoto advised that the "temporary Internet files" and "cache" on Flowers' workstation that the FBI had seized during the August 2013 search warrant, would have a listing of the recent websites that Flowers' had accessed. After the search warrant, Flowers was provided a new computer by PCC.

PCC and TBSC employees had virtual desktops. They were able to log on any workstation in the building and access their own desktop containing their personal files located on the server. When TBSC and PCC merged, the companies utilized a port system for employees to access the server. Employees were issued their own designated port to access the server. Flowers possibly used port 51. Omoto did not remember which port was assigned to Shields. Employee assigned port information is maintained on the collection server.

A shared desk is where multiple debt collectors have access to the same desk on the collections server. On both the PCC and TBSC collection server, new collection accounts start off on a shared desk. When collectors work on the account, the collector moves that debt account to their specific collections desk.

Joyce W. ran collections reports every morning, and posted the collections totals on the collections board located on the PCC third floor. The collector with the highest collections totals was consistently Flowers. Flowers collected a quarter of all collections for the company. There were a huge gap between Flowers and the next best collector.

Flowers worked a lot. He was eccentric. Flowers told Omoto that he had a way of finding people, and that he had a contact he would use to find people. This contact would provided Flowers with a debtors employment information. Omoto would hear Flowers talking to this contact on the phone. All other collectors at PCC used search engines such as TLO to locate a debtor. The other collectors were not able to locate a debtor's employment information. Based on Omoto's experience in the debt collection industry, Omoto did not know how a debt collector could obtain a debtor's employment information. Using a SSAN, a debt collector could typically only obtain a debtor's address and phone number utilizing the available search engines. It was widely known around the office that Flowers was not using standard industry techniques in obtaining debtor employment information. Flowers would brag about his source and show off his paycheck around the office.

Flowers befriended Omoto within a week of PCC merging with TBSC. Omoto felt that Flowers friendship was because Omoto was TBSC's data guy. Flowers asked Omoto for data which other debt collectors would not usually request. Flowers would ask Omoto to provide him a spreadsheet, on paper format, containing debtor accounts located in California and Nevada, over $1,000, which were not in litigation. Flowers requested only debtor name, social security account number (SSAN), and amount owed for these accounts. Flowers asked for California and Nevada accounts because PCC was licensed to litigate in those states. TBSC was licensed to litigate in all 50 states. Flowers was smart, he only targeted accounts he knew he could collect quickly. Other collectors would have to work harder to skip trace and collect on a debtor. Other collectors usually had to follow a script, while Flowers used his contact to obtain the employment status of a debtor, in order to garnish their wages.

Flowers and Shields were the only PCC employees who made special request to Omoto for debtor information. In addition to name, SSAN, and amount owed, Shields also asked for collection status. Shields would ask for this information once every few months. Shields would conduct batch processing on these account in order to see if the contact information associated with these accounts were still correct. Batch processing would entail taking the data, and sending it to a service, who would run the name and SSAN to

see if the address and phone number was up to date. If the service returned an updated address or phone number, then it would be input into PCC/TBSCs system.

It was unusual for Flowers to ask for this data. When Flowers first asked Omoto for this data, Omoto asked Shields if it was ok for Omoto to provide it to Omoto. Shields advised Omoto to give this information to Flowers. Shields asked Omoto to send Shields, via email, a copy of the spreadsheets Omoto gave to Flowers in order to ensure that Shields was not working on the same accounts as Flowers. Omoto only gave Flowers these spreadsheets in paper form. The last time Flowers asked for this spreadsheet was before the August 2013 search warrant. After the search warrant, Flowers did not ask for these spreadsheets. The last request Flowers made to Omoto was for a print out of debts from a specific client, Schools First, a few months after the search warrant. After the search warrant, Flowers was more concerned with the status of his existing, and was not concerned with obtaining new accounts to collect. After the search warrant, Flowers' collection numbers posted on the collection board lowered significantly. Flowers still maintained collections on accounts he had already established collections.

Flowers shared his contact with Ron Jacobs, who Omoto also knew as Michael Jackson. Flowers told Omoto that he was helping Jacobs by giving him access to his source, but that Jacobs had burnt that bridge. Since Jacobs stopped using Flowers' source, his collections totals had dropped.

Flowers did not specifically tell Omoto that Shields knew who Flower's contact was, but as the head of the company, Shields should have known who Flowers was using to generate at least 25% of the company's collections. If Omoto was in Shields position, he would want all employees at PCC using Flowers' contact. Shields was the only one who wrote checks for PCC. If PCC was paying Flowers' contact, Shields would be the person who paid the source. Omoto would sometimes see the PCC checkbook on Shields desk. The PCC accounting person, Lisa McCann, of their posting person, Maria Marquez, would know where Shields keeps the cancelled checks.

At this point in the interview, Omoto was shown page 2, of exhibit 11. Omoto advised the document looked like a typical report, similar to a credit report. Omoto advised that the PCC/TBSC system could not generate the type of data on the document shown to him.

After the search warrant, Flowers told Omoto that "they are not going to find anything," and "I didn't do anything, I don't know why they are here."

Shields didn't talk to Omoto about anything having to do about the search warrant. They "didn't talk about that stuff."

Omoto did not notice any destruction of information after the search warrant.

Shields did not have a personal assistant.

Flowers had used the fax machine in the PCC office all the time. He would use the fax making as frequently as several times a week. Other PCC employees would use the fax machine, but not as frequently as Flowers. Using the fax machine was not a typical method to skip trace.

Omoto could tell though Flowers' Internet usage history that Flowers did not use typical skip tracing techniques, and that he had limited computer knowledge. Flowers barely used the Internet. He could barely use his own personal e-mail. Flowers asked Omoto to help him use his Yahoo account and conduct searches on Lexis Nexis and TLO.

Roger Milstein, a consultant, speculated that Flowers wasn't doing things on the up and up.

Omoto and Nickaulas were the only ones with access to modify notes in collection accounts after the server had been backed up. Collectors could only modify their notes prior to their backup. Flowers would add notes to collection accounts he would work. If Flowers found information on another collector's account, he would put that information in the notes. He would sign his work with his initials "MF" in the notes section.

The rumor at PCC was that Greg Hudson was the person who notified authorities about the wrongdoing at PCC.

At this point in the interview, Omoto was shown Chase Bank surveillance photographs from 4/5/2013, 4/12/2013, 4/18/2013, and 4/26/2013. Omoto advised that the individual in all the photographs was Flowers.