# Exhibit 10

FD-302 (Rev. 5-8-10)

- 1 of 9 -

 OFFICIAL RECORD

UNCLASSIFIED//FOUO

### FEDERAL BUREAU OF INVESTIGATION

Date of entry 04/17/2014

Lisa McCann, born ▮▮▮▮, California Drivers License ▮▮▮▮ residing at ▮▮▮▮ Sherman Oaks, ca ▮▮▮▮ cell phone number ▮▮▮▮ was interviewed. Also present were Department of Labor Office of Inspector General (DOL-OIG) Special Agent (SA) Cory Oravecz, and Assistant United States Attorney (AUSA) Elisa Fernandez. After being advised of the official identities of the interviewers, and the purpose of the interview, McCann provided the following information:

McCann acknowledged that she attended the interview voluntarily. McCann was advised that the interview could be stopped at any time, and she was free to leave at any time. McCann was advised that she has the right to seek an attorney. McCann advised that she did not have an attorney and that she wished to continue the interview without an attorney present. McCann acknowledged that she had to be completely honest and truthful, and not omit any information.

McCann came forward because she had seen things at Professional Collection Consultants (PCC) during her time at PCC, which she felt was inappropriate.

McCann left PCC on March 6, 2014 on disability. McCann was advised not to mention anything that PCC attorneys had previously told her not to disclose.

McCann has approximately 15 years of accounting experience to include extensive experience concerning auditing functions. McCann began working for The Best Services Company (TBSC) approximately 8.5years ago as an Operations Manager. Her duties included handling everyday operations to include accounting, client trusts, client relationships, and overseeing small balance consumer collections. On approximately March 1, 2013, TBSC was purchased by PCC. On approximately March 16, 2013, TBSC left their Santa Monica location and moved into the PCC owned building located at 6700 S. Centinela Ave., Culver City, CA 90230.

Approximately six months prior to the merger, McCann worked with PCC President, Todd Shields on due diligence concerning the TBSC purchase.

UNCLASSIFIED//FOUO

---

Investigation on 03/19/2014 at Los Angeles, California, United States (In Person)

File # ▮▮▮▮ Date drafted 03/20/2014

by ESCONDE ALEX

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  Lisa McCann interview                    , On  03/19/2014 , Page  2 of 9

McCann provided Shields collection statistics, assignment information, and information inflow of business in order to assist Shields to make a business decision on whether or not to purchase TBSC.

TBSC was a third-party collection agency. Banks and creditors all over the nation hired TBSC to collect debt on their behalf. McCann advised that TBSC usually split their collections 35/65 - 40/60 with their clients. TBSC was audited on a regular basis for reasons such as state licensing for collections, security and compliance with Statements on Auditing Standards (SAS) 70.

PCC was a debt buyer. PCC would purchase debt from creditors for a portion of their worth. PCC then owned the debt, and retained any collections PCC made on that debt.

McCann advised that PCC did not have an internal accountant who performed the duties that she performed for TBSC. PCC outsourced their accounting and information technology (IT) functions. Additionally, Shields would provide collection management at PCC, a function McCann handled at TBSC. PCC did not have an internal Human Relations (HR) manager.

PCC's bookkeeper was Blanca Galvez, cell ▓▓▓▓-6801, landline (▓▓▓) ▓▓▓-6163. Galvex did not work in the PCC building. PCC regularly hired a courier to transport records back and forth to Galvez. McCann did not handle the accounting records for PCC, however, looked at their financial statements and recognized them to be similar to the Quickbooks accounting program financial statements. At first Galvez only handled the PCC books. McCAnn handled the TBSC accounting records. The TBSC and PCC accounting records were not co-mingled. After McCann left the company, Galvez began to take responsibility of the TBSC accounting records. Approximately one week ago, Galvez called McCann for help with the TBSC accounting records.

McCann advised all of PCC's financial records are computerized, and are maintained by Galvez. All financial reports are stored in the safe inside of Shields office. Shields maintained all of PCC's checkbooks in the built in cabinets inside of his office. These cabinets are located on the left side when walking into Shields office. McCann has not seen Shields carry the registers outside of his office.

Pcc was only licensed to collect in Nevada. In approximately April or May 2013, McCann assisted Shields with an audit performed by the State of Nevada for PCC's license. Licensing for the state was due in March. PCC was late with their submission, which is why McCann was asked to assist Shields in April or May. For their licensing submission in the audit, PCC needed to to submit financial statements, reviewed by a Certified Public Accountant (CPA). Shields kept PCC's financial statements in the safe

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  Lisa McCann interview  , On  03/19/2014 , Page  3 of 9

located in his office. Based on McCanns experience in the accounting industry, she believed these financial statements were created using the Quickbooks accounting program. McCann advised that the records Shields had were not reviewed by a CPA. Shields advised McCann that he had a friend who was a CPA, then a couple hours later, Shields had a letter stating that the PCC financial statements were reviewed by a CPA. McCann felt that Shields provided a falsified CPA letter to the auditors. Galvez was only a bookkeeper and not a CPA. This letter was submitted to the State of Nevada, Department of Financial Institutions.

Shields, Don Hoppe, Carol Hoppe, and Clark Garen owned or had an financial interest in PCC. PCC had multiple entities.

PCC maintained their bank accounts at Wells Fargo. They had separate accounts including payroll, general, and legal. The legal account was used by the legal department to pay court costs in suits.

Before the merger, TBSC maintained their banking at Bank of America. After the merger, Shields chose to bring all TBSC accounts over to Wells Fargo.

TBSC bank statements were maintained and reconciled by McCann. She kept these statements in the file cabinet in her office.

After the merger, McCann handled the internal HR function of payroll for both PCC and TBSC. McCann managed the time clock and employee time cards. After McCann calculated the employee hours, she informed Galvez the amounts each employee was to receive on their paychecks. Galvez then would send the payroll totals to the company's payroll service to prepare their paychecks. McCann stored payroll information both electronically on her server drive and on a hard copy in the files in her office. Her electronic files could be found on the :L network drive at PCC, in the "payroll" folder.

Not all of PCC's employees were on time cards. Exempt employees were not on a time card. Debt collectors were non-exempt employees, and were required to be on time cards. In California, in order to be an exempt employee, that employee would have to be in capacity to make business decisions without approval or manage staff. McCann noted that some people at PCC did not fall into those criteria were classified as exempt employees.

McCann advised that the skip tracer's and debt collector's roles differed between TBSC and PCC. Skip tracers typically were tasked with finding information to help make an account more collectible. Skip tracers searched for items such as a debtor's telephone number, employer, and address. At TBSC, this was done through industry vendors such as Accurint,

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of Lisa McCann interview , On 03/19/2014 , Page 4 of 9

and Lexis Nexus. These providers would conduct reviews of TBSC's collection practices to ensure they were conducting business legally. They would audit for permissible purposes. Once skip tracers found the contact information for a particular debtor, debt collectors would typically handle the actual collection of debt from the debtor. At TBSC, skip tracers were allowed to collect small balances. Additionally, debt collectors would typically skip trace larger balance accounts.

When first starting work at PCC, McCann noticed PCC had a large white board in the middle of the office. This white board contained the collection totals for all collectors. These collection totals were updated daily. Mike Flowers' collection totals were consistently approximately 25% of the entire company, which was unusual. PCC had approximately 7-10 collectors.

Flowers was very vocal and very impressed with himself. Soon after McCann moved into the PCC office, Flowers showed her his check stub, which indicated that Flowers had earned a $12,000 commission for the prior month. McCann could not recall Flowers' exact salary amount, but advised that it was only a fraction of Flowers' commission check. McCann normally handled payroll and noted Flowers was an exempt employee, and didn't have to punch in or out on a time card.

Todd Shields, and Tanya Jones, whose real name was Josephine Young, calculated the bonuses for the debt collectors. After the merger, TBSC collectors were set up on the PCC bonus schedule. McCann recalled that at PCC, collectors needed to collect a minimum of three times their monthly salary in order to be eligible for a bonus. Collectors earned 10% of debt they collected over the minimum. Flowers earned a bonus different from the other collectors. McCann did not think Flowers was required to meet the minimum collection level. Flowers received a bonus of 10% from his monthly collections. McCann retained the monthly bonus calculations in her e-mail account. Occasionally McCann would save the bonus calculation files in the payroll folder on her server drive.

When PCC moved their e-mail service over to a new server in PCC's building, McCann was able to access all of her pre-transition emails. McCann did not note any missing e-mails when she reviewed her account after the e-mail server transition.

Shields would regularly send a package of bills and payroll to Galvez through Universal Courier and Valley Courier. Galvez was not competent enough to complete multiple tax returns for multiple entities.

It was clear when TBSC merged with PCC that legacy PCC employees did not have knowledge of debt collection laws or knowledge of how to collect debt

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of Lisa McCann interview ,On 03/19/2014 ,Page 5 of 9

ethically. Legacy PCC collectors would normally yell and scream at debtors. Additionally, they would manipulate each other and steal accounts and payments from each other. Collectors from TBSC did not steal from each other. McCann explained at PCC, collectors had dedicated desks where their collection accounts are placed. She had known PCC collectors to move accounts from other collectors onto their own desks.

Jones was unethical. McCann had known Jones to email debtors which was not allowable.

Flowers would come into work drunk, and would put down other collectors.

Flowers initially told McCann he was a skip tracer, and that he did not collect from debtors. Flowers indicated that he found debtors employment, and that once he found a debtor's employment, that account went to PCC's legal department for collections. Flowers carried a pager while on PCC property. McCann recalled one time Flowers' pager had rang, and Flowers' announced "that's my money!" McCann advised that Flowers was getting business calls on an outside line, which was not appropriate. Collectors were not allowed to use their personal cell phones, or even have them at their desk. This was because PCC would lose the ability to secure confidential information and record calls. Flowers calls on his business line were next to nothing. Flowers was not making outbound calls or receiving inbound calls. He was using a pager or personal cell to conduct business. Additionally, Flowers used the fax a lot. As a result, Flowers calls were not being recorded.

PCC employees were told not to conduct business on their personal phones or e-mail accounts.

Flowers would regularly ask McCann to provide him with debt inventory on spreadsheets. The only data Flowers would request was account number, debtor name, social security account number (SSAN), and debtor state. Initially, McCann asked Flowers for his e-mail account, so that she could e-mail Flowers a spreadsheet. Flowers advised McCann that he only wanted the information on paper. Because SSANs are very secure, there are a lot of red flag guidelines on how to dispose of documents containing SSANs. McCann felt that printing SSANs raised security concerns. McCann raised this concern with Shields when Flowers first made a request for debt inventory. Shields told McCann to "get Mike what he wants."

Normally, McCann would not print debt inventory reports for collectors. Someone skilled enough to manipulate date would be skilled enough to use a spreadsheet.

Flowers was only concerned with an individual's name, SSAN, and state. She

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of Lisa McCann interview , On 03/19/2014 , Page 6 of 9

never asked what he wanted the information for. McCann noted that Flowers would go through the lists and put notes such as "no employment info – MF." Flowers would add nothing else on the account on how he obtain his information. Normally collectors would add notes such as "searched accurint" or "called so and so," in order to document their sources of information. McCann advised Michael Jackson did not list notes either.

Sterling Rice worked with Flowers. Rice would also note employment information on debt accounts in the system. McCann felt it was obvious that Flowers was using a source that was not accessible to all of the collectors. One day, McCann had a conversation with Jones, prior to the day J~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~. Jones told McCann that since she didn't specifically know the identity of Flowers' source, she can't say anything in grand jury. McCann advised that everyone at PCC knew Flowers had a source that no one else had access to.

When McCann printed out Flowers' spreadsheets, she assumed he used the spreadsheet for skip tracing. She never saw Flowers fax the list out.

McCann never received e-mail from Flowers. McCann would occasionally receive e-mails from other collectors. Not all collectors had e-mail, however, in almost a year, McCann never even saw Flowers copied on an PCC email.

McCann advised Flowers once showed McCann a document which contained debtor employment information including the employer name of El Pollo Loco, and quarterly wage information. Flowers asked McCann "how do you think a person who works at El Pollo Loco makes this much money?" Normally, a document containing quarterly wage information is not available to a debt collector as this is not public information. This information is only provided to the State by the employer on quarterly payroll returns. Other than the debtors employer, and government agencies, the quarterly ware information would not be available from any other source. McCann felt Flowers having this information was illegal. She did not ask where Flowers' obtained this information nor did she report these documents to Shields.

In the past, Shields would ignore when McCann pointed out instances where PCC was conducting business outside regulations. For example, McCann noted non-exempt employees were working off the clock. Since these employees were off the clock, they were not allowed to take calls. McCann advised that some PCC employees would take calls, and theoretically take commissions away from employees who were still on the clock. McCann advised Shields of these practices. Shields sent out two emails in response to McCAnn's concerns. First, Shields sent out an e-mail stating to ignore his follow on e-mail. Second, Shields sent out an "on the

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  Lisa McCann interview _____ , On  03/19/2014 , Page  7 of 9

record" e-mail stating PCC's policy that non-exempt are not allowed to work off the clock.

McCann advised that she almost got into a fist fight with a collector who was punched out and was still working.

When TBSC first merged with PCC, Shields assigned Flowers to review all TBSC accounts. Flowers worked from 7am to 9pm daily going through TBSC's accounts. During the first two months, McCann provided Flowers with lists containing debtor SSAN. After about the fifth month after the merger, McCann noted that Flowers had wage information for debtors.

McCann recalled an instance which raised concerns about Shields and Flowers business practices. She had walked into Shields office while Shields and Flowers were talking. McCann told Shields "did you hear, Mike is going to train me to do what he does." Shields responded "you can do what he does?" At that point, Shields and Flowers laughed. McCann took Shields and Flowers reaction to indicated that Flowers does not actually skip trace, and that Flowers was doing something that she could not jump in and do.

McCann advised that she asked Shields about Flowers financial situation since Flowers had a large Franchise Tax garnishment on is wages. McCann advised that Flowers owed the State of California a large amount of money. McCann advised that Flowers typically earned a bonus of approximately $9,000 or more. Shields told McCann that Flowers had a non-profit that he spent a majority of his money.

McCann never talked to Shields about the source Flowers used to obtain quarterly wage information.

McCann advised that what Flowers was doing in the office was common knowledge to everyone in the office. He was using a source that no one else had access. McCann advised that this information was available to Shields and that there was no way that Shields could not know the identity of Flowers source.

At this point in the interview, McCann was asked about her role in PCC's response to a Federal Grand Jury Subpoena served on PCC in the Fall of 2013. McCann advised that Shields assigned her to photocopy documents in response to this subpoena. Shields had called McCann into his office and asked her to photocopy some things. When McCann arrived at Shields office, Shields went to his file cabinet and pulled out a file, McCann advised was Flowers personnel file. He then flipped through the file, pulled out some documents from the file, and asked McCann to make a copy of the remaining pages.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of Lisa McCann interview , On 03/19/2014 , Page 8 of 9

PCC maintained two files for their employees, a personnel file maintained by Shields, and a human resources (HR) file maintained by McCann. Shields had also asked McCann to bring Flowers human resources file to his office in order to be copied. Shields looked through this file before handing it back to McCann to be copied for the subpoena response. McCann recalled the personnel file contained an acknowledgement for skip tracing permissible purposes, a notice Flowers was flagged for suspicious searches, and a memo issued to Flowers for permissible searches. McCann was unable to see which documents Shields pulled out of Flowers personnel file since she was standing in Shields doorway. McCann did not see whether Shields destroyed the documents, but noted Shields does not have a shredder in his office. McCann did not notice anything missing from the HR file after Shields had reviewed its contents. In the HR file, McCann typically kept an employees W4, and other job related items such as position, rate or pay changes, and any disciplinary items. McCann recalled that Flowers had been reprimanded for yelling at another employee.

McCann also copied quarterly payroll report in response to the Federal subpoena. McCann copied approximately two years of quarterly payroll reports, but noted that two quarters in this period were missing. This omission was not on purpose.

Payroll disbursement for regular salary and commissions came in two separate checks. Bonuses are categorized as bonuses on the PCC paychecks. Payroll is prepared by Paychex Advantage Payroll service. Galvez sends the salary calculations to Gloria Armenta at Paychex Advantage.

McCann previously received a W2 when she worked at TBSC. McCann had not seen the PCC year-end summary for 2013 and did not have access to her PCC W2. She had previously advised Shields that she needed her 2013 W2 for her 401k calculations.

McCann retained some of her emails for a future civil suit against PCC. In these emails, Shields would direct McCann not to do certain things which McCann felt should have been done. Additionally, she retained files of database searches which were provided to Flowers. These files were saved as spreadsheets in her computer, and would be saved in the respective clients folder, as well as her "LM" folder on her server drive.

Flowers was originally referred to Shields for a job at PCC by Mike Nicholas, who was PCCs IT vendor. Clark Garen owned a part of the company who developed the software PCC currently used. Nichols was the programmer who trouble shot issues PCC had with the software.

UNCLASSIFIED//FOUO

Greg Hudson was very vocal and gossiped around the office. The day of the Government search warrant, Hudson, McCann, Erica Gonzalez, and Beben Pole were talking outside of the PCC building. The group had felt that Flowers was finally busted.

When Agents first made entry into the PCC building, McCann was in Shields office with the door shut.

McCann heard a rumor that Shields had hired a private investigator.

Shields carried a briefcase to and from the office. From time to time McCann knew Shields to transport a server backup to his home. At TBSC, backups were stored in a security deposit box.

McCann did not know if PCC had a petty cash account. McCann advised that she did not maintain such an account. She did not think Shields would allow any other PCC employee, other than himself, to handle the petty cash account. McCann recalled that Shields occasionally gave cash bonuses on the PCC floor.

Shields did not have an assistant. He handled everything himself. Shields essentially did the job McCann had a TBSC, for PCC. He moved around accounts and secured data. Jones skill set was not "up to par" which is why Shields handled these tasks by himself. Additionally, Shields was a control freak.

McCann wanted to leave PCC partially because she felt she would have to do unethical things. PCC had an upcoming audit on their business practices on the maintenance and security of their data. This audit was to determine whether personal and private data was not being handled in secure methods. If McCann stayed at PCC during this audit, she felt she would have to bend the truth when questioned by the auditors.

TBSC was audited annually by a third party auditor, Audit Works. Joe Madden was the previous point of contact (POC) for Audit Works. Michael Townsend was the current POC.